```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   UNITED STATES OF AMERICA        .  CR. NO. H-12-730
                                     .  HOUSTON, TEXAS
 4   VS.                             .
                                     .  AUGUST 26, 2013
 5   YOLANDA NOWLIN                  .  12:45 P.M. to 4:20 P.M.

 6

 7                          DAY 1 of 7
                         TRANSCRIPT of TRIAL
 8               BEFORE THE HONORABLE SIM LAKE
            UNITED STATES DISTRICT JUDGE, and a JURY
 9

10   APPEARANCES:

11
     FOR THE GOVERNMENT:            MS. ADRIENNE E. FRAZIOR
12                                  MS. SUZANNE BRADLEY
                                    U.S. Attorney's Office
13                                  1000 Louisiana
                                    Suite 2300
14                                  Houston, Texas   77002

15

16   FOR THE DEFENDANT:            MR. MICHAEL M. ESSMYER, SR
                                   MR. MICHAEL ESSMYER, JR.
17                                 Essmyer & Daniel, P.C.
                                   5111 Center Street
18                                 Houston, Texas   77007

19

20

21   THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
     CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
22   COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
     ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
23   COPY AT THE OFFICIAL RATE.   General Order 94-15, United States
     District Court, Southern District of Texas.
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

1                          <u>APPEARANCES CONTINUED</u>

2

ALSO PRESENT:                        MS. CHRISTINE FINNEGAN
3                                    MR. RICK MCCOLLUM
                                     MS. DEBRA GREGORY
4

5

OFFICIAL COURT REPORTER:             MS. KATHY L. METZGER
6                                    U.S. Courthouse
                                     515 Rusk
7                                    Room 8004
                                     Houston, Texas   77002
8                                    713-250-5208

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

                                                          PAGE

VOIR DIRE                                                    5


OPENING STATEMENTS

By Ms. Frazior                                              60
By Mr. Essmyer                                             65


GOVERNMENT'S WITNESS

Eleanor Brown
  Direct Examination by Ms. Frazior                        71
  Cross-examination by Mr. Essmyer, Sr.                    87
  Redirect Examination by Ms. Frazior                      97
  Recross-examination by Mr. Essmyer, Sr.                 100

* * *

1                    P R O C E E D I N G S

2          *(12:45 p.m., Open court, defendant present.)*

3          *THE COURT:*  We just got the questionnaires.  We have

4   three jury trials starting and it's just taking them a while

5   with the addition of the supplemental questionnaires.  So can

6   we start at 1:30?  Will that give you enough time?

7          *MR. ESSMYER, SR.:*  Whatever time the Court wants.

8   1:45 would be better than 1:30, though.

9          *MS. FRAZIOR:*  I'm fine with either, Judge.

10          *THE COURT:*  Let's try -- my concern is if we wait too

11   late, we won't pick them today.  I hate to have 42 people come

12   back tomorrow.  Let's try for 1:30.

13          *MR. ESSMYER, SR.:*  Yes, Your Honor.

14          *(Recess from 12:47 p.m. to 1:30 p.m.)*

15          *(Open court, defendant present.)*

16          *THE COURT:*  Good afternoon.  Please be seated.

17               We're here this afternoon for jury selection and

18   trial in United States of America versus Yolanda Nowlin,

19   Criminal Action H-12-730.  Will counsel please identify

20   themselves and their clients for the record.

21          *MS. FRAZIOR:*  Adrienne Frazior for the United States.

22          *MS. BRADLEY:*  And Suzanne Bradley for the United

23   States.

24          *MR. ESSMYER, SR.:*  Mike Essmyer being assisted by --

25   Mike Essmyer, Sr., being assisted by Mike Essmyer, Jr.  And the

1   client, Ms. Yolanda Nowlin, is present.

2            *THE COURT:*  Okay.  Are both sides ready to proceed?

3            *MS. FRAZIOR:*  Yes, Your Honor.

4            *THE COURT:*  I looked at the questionnaires and I

5   called an unusually large number of potential jurors because I

6   thought there might be some issues with the Labor Day weekend,

7   but I don't see any issues.  So restrict your individual

8   questions to the first 35 people.  Don't ask questions to the

9   last seven, because I don't think we're going to get there.

10  Okay.

11           Where is Andrew?  Go tell him to bring the jury

12  in.

13       *(Jury venire panel present.)*

14           *THE COURT:*  Please be seated, ladies and gentlemen.

15           Good afternoon, ladies and gentlemen.  I would

16  like to welcome you to the United States District Court for the

17  Southern District of Texas.  I know you've been here for some

18  time, and I want to thank you for your patience.  We had an

19  unusually large number of jury trials starting today and it

20  took the jury section longer than usual to process all your

21  questionnaires, plus I know each of you filled out a separate

22  questionnaire, which we appreciate.  That will save everyone

23  time this afternoon as we select a jury.

24           We're going to select a jury today to preside

25  over a very interesting criminal case.  Many federal trials

1    last a month or more, but this case will only last two weeks.

2    I think that the case will probably be concluded by the end of

3    next week.  As you can see by the number of participants and

4    exhibits, it's a fact-intensive case.  And those of you who are

5    lucky enough to be selected, I believe will find that it's a

6    very interesting case.

7              What we're going to do for the next hour or so is

8    decide which of you actually get to hear the case.  Each of you

9    is qualified to serve as jurors.  The process we go through to

10   determine which of you actually hears the case is a process of

11   elimination.  Each side is allowed to excuse a potential number

12   of jurors without stating the reasons for doing so.  These are

13   known as peremptory challenges.  In addition, each side can ask

14   the Court to excuse an additional number of potential jurors by

15   making what is known as a challenge for cause.

16             A challenge for cause is a challenge addressed to

17   me.  If I agree, I excuse that potential juror.  If I do not

18   agree, that person remains on the jury panel subject to any

19   challenges -- peremptory challenges.  So in order for the

20   lawyers to know how intelligently to exercise their peremptory

21   challenges, in order for the lawyers to determine whether they

22   should make any challenges for cause, we need to know a little

23   bit more about you than what is revealed through the standard

24   Southern District questionnaire.  That's the reason we had each

25   of you fill out an additional questionnaire tailored to this

 1  case.

 2              Also, I'm going to tell you a little bit about

 3  the case and ask you some general questions, and then let the

 4  lawyers ask you a few additional questions so that they can

 5  more intelligently determine how to exercise their challenges.

 6              First, let me tell you a little bit about the

 7  case.  This is a criminal case.  The defendant is Ms. Yolanda

 8  Nowlin.  Would you please stand up, ma'am?  Ms. Nowlin lives in

 9  Bryan, Texas.  Do any of you ladies and gentlemen know Ms.

10  Nowlin?

11              I see no hands.

12              Thank you.  You may be seated.

13              Ms. Nowlin is charged with an indictment to

14  commit health care fraud, conspiracy to commit health care

15  fraud, conspiracy to violate the antikickback statutes, and

16  Social Security fraud.  These charges all relate to two

17  businesses that Ms. Nowlin operated in Bryan, Texas.  The names

18  of these two businesses are Yellabone, Y-e-l-l-a-b-o-n-e, Medic

19  Care Express Equipment Supply Company and Yellabone Medical

20  Equipment, Inc.

21              Have any of you, ladies and gentlemen, ever heard

22  of either of those companies?

23              I see no hands.

24              All right.  Have any of you, ladies and

25  gentlemen, heard anything about this case?

1            Again, I see no hands.

2            All right.  Ms. Nowlin is represented by Attorney

3   Michael Essmyer and his son Michael Essmyer, Jr., who are now

4   standing.  They are both prominent attorneys here in Houston.

5   Do any of you know either Mr. Essmyer or his son, also named

6   Mr. Essmyer?

7            I see no hands.  Thank you.

8            The United States is represented by attorneys

9   Adrienne Frazior, who's now standing, and Suzanne Bradley,

10  who's now standing.  Do any of you know Ms. Frazior or

11  Ms. Bradley?

12           I see no hands.  Thank you.

13           They work for the United States attorney for the

14  Southern District of Texas, whose name is Ken Magidson.  There

15  are a number of attorneys, investigators, and other employees

16  of the U.S. Attorney's Office.  Do any of you, ladies and

17  gentlemen, know any employees of the United States Attorney's

18  Office for the Southern District of Texas?

19           All right.  I see no hands.

20           Have any of you had any dealings with the United

21  States Attorney's Office for the Southern District of Texas?

22           Again, I see no hands.

23           All right.  I want now to explain some very

24  important rules that apply in criminal cases.  I told you that

25  Ms. Nowlin is charged with various crimes in an indictment.  An

1    indictment is merely a charge.  It is not evidence of guilt or

2    any wrongdoing by Ms. Nowlin.  As Ms. Nowlin sits here this

3    afternoon, the law presumes her to be innocent of all the

4    charges brought against her.  The whole purpose of having a

5    trial is to determine whether in fact the government can prove

6    any of the charges brought against Ms. Nowlin.

7              So I instruct you that the fact that she has

8    been indicted is not evidence of guilt or wrongdoing, that

9    Ms. Nowlin is presumed to be innocent, and that the presumption

10   of innocence remains with her until such time, if ever, that

11   the government can prove her guilt.

12             Moreover, since Ms. Nowlin is presumed to be

13   innocent, she has no obligation to call any witnesses, present

14   any evidence, or testify.  It is her right under the

15   Constitution and laws of the United States to require the

16   government to bring witnesses and evidence in the court to

17   prove her guilt.  She has no responsibility or burden of

18   disproving the charges brought against her.

19             Finally, I instruct you that the government's

20   burden of proof is to show Ms. Nowlin is guilty beyond a

21   reasonable doubt.

22             Now, I've summarized some very important rules of

23   law.  Before we go any further, I want to be sure that all of

24   you, if you're selected as jurors, can conscientiously follow

25   all of those rules of law.  The rules are, again, the

1    indictment is not evidence of guilt or wrongdoing.  Ms. Nowlin

2    is presumed to be innocent.  The government and only the

3    government have the burden of proof, and the government's

4    burden is to prove guilt beyond a reasonable doubt.

5                Do any of you, ladies and gentlemen, believe that

6    if you were selected as a juror in this case, you could not

7    conscientiously and fairly follow all of those rules of law?

8    If any of you have any doubt about your ability to

9    conscientiously and fairly follow those rules of law, would you

10   please raise your hand now so that we can explore the matter

11   further.

12               I don't see any hands.

13               The only other question I want to ask you

14   about -- well, I have two other questions to ask you about.

15   First, I'm going to read a list of witnesses who may be called

16   in this case.  And after I've read about the 20th name, you're

17   going to be suspicious.  You're going to say, I don't think the

18   judge is being honest with us when he says it's only a two-week

19   trial.  But I am being honest with you.  The lawyers have to

20   list all of the people who might be called as witnesses.  So

21   you're going to hear a lot of names.  I'd be surprised if

22   10 percent of these people are called.

23               But what I'm going to do is read the names and if

24   you recognize these people, raise your right hand after I read

25   each name.  And if some of these people are at the government's

1    table or the defense table when I read your name, please stand.

2              Special Agent Christine Finnegan of the Health

3    and Human Services Administration.

4              You may be seated.

5              Investigator Rick McCollum of the Medicaid Fraud

6    Control Unit.

7              You may be seated.

8              Auditor Kalpana Patel of the Medicaid Fraud Unit;

9    Investigator Daniel Castillo; Mark Porter of the Health

10   Insurance Specialist; Stephen Scott Ward of Health Integrity;

11   Sharon E. Thompson; Jonathan Bergey -- that's B-e-r-g-e-y -- of

12   CGS Administrators; Rosia Benford; Stasha Turner; Eleanor

13   Brown; Linda Chopp, C-h-o-p-p; Dr. Michael Ruggiero,

14   R-u-g-g-i-e-r-o; Rebecca Blacklock; Robert Brown; Betty Brown;

15   Dr. Wade Farrow, F-a-r-r-o-w; Dea Almanza; Ada Taylor; Victoria

16   Johnson; Frank Bosquez; Marcia Coker; Sandy Sap; Gregory

17   Riegsecker, R-i-e-g-s-e-c-k-e-r; Gene Kulon, K-u-l-o-n; Marilyn

18   Cates; James B. Westfall; Doug Ferguson; Darren Lindstrom;

19   Cherie L. Antoniazzi, A-n-t-o-n-i-a-z-z-i; Shannon Price; Alex

20   Liberman; Cory Eberle; Susan Langley; Heng-Chuan Chung; Thomas

21   N. Adams; Timmie Eads; Special Agent Gary Dickens; Deborah

22   Tolliver; Bradley Howard; Latisha Cleveland; Maria Hernandez;

23   Dorothy Adams; Lonnie Wallace; Lurese Terrell; Terri Ross;

24   Tasha Morgan; Minister Roderick Ross; Robert Williams; Minnie

25   Bullock; Frank Bosquez, Jr.; Leonard Jones; Dorothy Foster;

1    Margaret Parnell; Evan Parnell; Gina Reat, R-e-a-t; Cassandra

2    Blue Parnell; Larry Jones; Ella Gooden; Cheryl Wilson; Gary

3    Johnson; Melonie Nickerson; Leonard Nickerson; Tami Hayes;

4    Lonnie Wallace; Robert Pennie; Silvia Gongora, G-o-n-g-o-r-a;

5    Alex Udorah, U-d-o-r-a-h; Linda Binford; Dr. Haji, H-a-j-i;

6    Fayola Jones; Gina Morgan; Kennze Stephens; Danielle Costillon

7    Wendy Sablatura; Cassandra Tennell; Stashia Turner; Angie

8    Banks; Flavia Sweeps; Kimberly Reed; Lorenza Charles Nowlin;

9    Jerry Tennel, Jr.; Jerremey Tennell; Lois Gooszy; M. Nowlin;

10   Rosie Benford; Robert Brown; Pankie Freeman; and Mable McGowan.

11              I saw no hands with respect to any name.

12              The final matter that I want to discuss with you

13   is your involvement with the criminal justice system.  A

14   citizen of this country can become involved with the criminal

15   justice system in three ways.  A citizen can file a complaint,

16   which law enforcement will then investigate and it may result

17   in a criminal case; a citizen may have a criminal charge filed

18   against him by some government agency; or a citizen may be a

19   witness in a criminal trial.

20              I'm going to ask each of you whether any of you

21   falls within any of those categories, and I want to alert you

22   now, if you raise your hand, I'm going to ask that you come up

23   to the bench so that we can discuss the matter.

24              My question is:  Have any of you either filed a

25   complaint that resulted in a criminal case, been a witness at a

1  trial in a criminal case, or had a criminal charge filed

2  against you.  If any of you fall within any of those three

3  categories, would you please raise your right hand.

4           I see two hands.  Raise them up high.  All right.

5  Will you please come up and we'll talk about it at the bench

6  privately.  I think it's No. 22 and 14.  One counsel per side

7  may approach the bench.

8       *(The following proceedings were at the bench:)*

9       THE COURT:  Please come up, ma'am.  Would you please

10  tell me your name.

11      PROSPECTIVE JUROR:  It's XXXX XXXXX.

12      THE COURT:  And you're No. 22?

13      PROSPECTIVE JUROR:  Yes.

14      THE COURT:  What involvement do you have in the

15  criminal justice system?

16      PROSPECTIVE JUROR:  Well, I'm not -- my memory is a

17  little bit fuzzy on this, but a couple of years ago someone

18  hacked into my banking account and so it was a matter of

19  identity theft.  And I think the case is still pending.  I

20  don't know if it's federal or if it's a state thing.  And the

21  investigators have told me that they may call me, they may not

22  call me to testify against the case that they're making against

23  the person, and that's really all I know about it at this time.

24      THE COURT:  Have you appeared before a grand jury?

25      PROSPECTIVE JUROR:  No, I have not.

1        *THE COURT:*  Did you -- did the fraud result in a

2   substantial loss to you?

3        *PROSPECTIVE JUROR:*  Actually it did not.  It was all

4   resolved with the vendor, and so that was all restored on my

5   end.  But what I know from, like, from the police department of

6   Friendswood and so forth is that they were going to go ahead

7   and press charges.  And so I was contacted by one of the court

8   systems.  And I've moved, and so I have the paperwork but it's

9   in a box somewhere.  They have said just, you know, at some

10  point we'll contact you, if we need you, and that's where it's

11  at.  And I haven't heard from them since.

12       *THE COURT:*  Okay.  Is there anything about that

13  experience that would prevent you from being a fair and

14  impartial witness in this case?

15       *PROSPECTIVE JUROR:*  No, no, not at all.

16       *THE COURT:*  Any questions?

17       *MR. ESSMYER, SR.:*  Yes, Your Honor.

18            There may be allegations of -- and there's

19  different types of identity theft, one of which is a Medicare

20  number or a Social Security number.  And so there may be

21  allegations of Medicare or Medicaid numbers being misapplied or

22  taken.

23       *PROSPECTIVE JUROR:*  Uh-huh.

24       *MR. ESSMYER, SR.:*  Would your experience with your own

25  identity theft case bias you or prejudice you against a

1   defendant who's charged with such allegations?

2           PROSPECTIVE JUROR:  No, I don't think so.

3           MR. ESSMYER, SR.:  You think you can live with it?

4           PROSPECTIVE JUROR:  Yeah.

5           MR. ESSMYER, SR.:  And be a fair and impartial juror?

6           PROSPECTIVE JUROR:  Sure.  I do.

7           MS. BRADLEY:  I don't have any questions.

8           THE COURT:  Thank you, ma'am.  You may have a seat.

9           PROSPECTIVE JUROR:  Okay.

10      (No. 22 left the bench.)

11          THE COURT:  I believe there's two gentlemen.  Number

12  14, would you please come forward, sir?

13          MS. BRADLEY:  Your Honor, No. 14, I personally know.

14  I don't know that he recognizes me.

15          THE COURT:  You what?

16          MS. BRADLEY:  I know XXXX, No. 14.  We used to work

17  cases together.

18          THE COURT:  Come up here a second, please, sir.

19              Ms. Bradley says she --

20          PROSPECTIVE JUROR:  Well, it took me a minute after I

21  heard her.

22          MS. BRADLEY:  Age is a terrible thing.

23          THE COURT:  Well, how do you know her?  How do you

24  know her?

25          PROSPECTIVE JUROR:  I work for the -- a regulatory

1    agency with the State of Texas, with the Texas Department of

2    Health Services and we were on some cases together, some trials

3    and such, Your Honor.

4              THE COURT:  Do you help develop cases?

5              PROSPECTIVE JUROR:  At the time I did, yes, sir.

6              THE COURT:  You've heard the nature of this case and

7    you know one of the prosecutors.  Could you be fair and

8    impartial in this case?

9              PROSPECTIVE JUROR:  I think I could.

10             THE COURT:  In your heart of hearts, do you think that

11   you could be fair to both sides in this case?

12             PROSPECTIVE JUROR:  Yes, sir, I think I could.

13             THE COURT:  Do you think the defendant's probably

14   guilty since she's been charged with something?

15             PROSPECTIVE JUROR:  No, sir.

16             THE COURT:  If the government failed to prove guilt

17   beyond a reasonable doubt, would you have any doubt about your

18   ability to find her not guilty?

19             PROSPECTIVE JUROR:  No, sir.

20             THE COURT:  Okay.  What involvement do you have with

21   the criminal justice system other than what you've just

22   described?

23             PROSPECTIVE JUROR:  I was on a law enforcement task

24   force from 2002 to 2005 concerning infant formula being stolen

25   and resold through WIC, fraud.

1          *THE COURT:*  Okay.  Have you ever been involved
2    investigating Medicaid fraud or Medicare fraud?
3          *PROSPECTIVE JUROR:*  No, sir.
4          *THE COURT:*  Anything, Mr. Essmyer?
5          *MR. ESSMYER, SR.:*  Well, you see, sir, you said, "I
6    think.  I think I could be fair," and that sort of makes the
7    hair on the back of my head stand up.  Does that mean that you
8    may have some prejudice against my client from the very
9    beginning because of your background?
10          *PROSPECTIVE JUROR:*  Surely I probably do, not
11    necessarily against your client, but --
12          *MR. ESSMYER, SR.:*  Against that type of allegation?
13          *PROSPECTIVE JUROR:*  Yes, sir.
14          *THE COURT:*  I think we're going to excuse you.  So
15    don't answer any other questions.
16          *PROSPECTIVE JUROR:*  Okay.
17          *THE COURT:*  No matter what the question is, just
18    remain silent.
19          *PROSPECTIVE JUROR:*  Okay.
20          *THE COURT:*  Have a seat.
21      *(No. 14 left the bench.)*
22          *THE COURT:*  And last but not least, number -- I can't
23    see your number.  Come up, please, sir.
24              Hi.  Would you tell me your name, sir.
25          *PROSPECTIVE JUROR:*  XXXXXXX XXXXXX.

1          *THE COURT:*  You're No. 41?

2          *PROSPECTIVE JUROR:*  41, uh-huh.

3          *THE COURT:*  What involvement have you had in the

4     criminal justice system?

5          *PROSPECTIVE JUROR:*  I was arrested in 2002.

6          *THE COURT:*  For what?

7          *PROSPECTIVE JUROR:*  Domestic dispute.

8          *THE COURT:*  Were there charges brought against you?

9          *PROSPECTIVE JUROR:*  It was dismissed.

10          *THE COURT:*  And were you convicted of that?

11          *PROSPECTIVE JUROR:*  No.

12          *THE COURT:*  Okay.  Do you think you were treated

13     fairly by the law enforcement people who you dealt with?

14          *PROSPECTIVE JUROR:*  For the most part.

15          *THE COURT:*  Do you think you were treated fairly by

16     the court?

17          *PROSPECTIVE JUROR:*  Yes.

18          *THE COURT:*  In this case Ms. Nowlin is charged with a

19     crime.  You've been in this position of being charged with a

20     crime that was later dismissed.  Could you be fair to both

21     sides in this case or would you tend to think Ms. Nowlin has

22     probably gotten a raw deal here?

23          *PROSPECTIVE JUROR:*  Actually I feel the other way.  I

24     think that anybody that's come this far in the system is

25     probably guilty.

1        *THE COURT:*  Because she's been indicted, you think
2   she's probably guilty?
3        *PROSPECTIVE JUROR:*  Yes.  I don't think a lot of
4   people would spend a lot of time unless they knew that they
5   could find her guilty.
6        *THE COURT:*  Okay.  You've already heard my
7   instruction, that you're to presume her not to be guilty.
8        *PROSPECTIVE JUROR:*  I understand.
9        *THE COURT:*  But you think she's probably guilty?
10       *PROSPECTIVE JUROR:*  I do.
11       *THE COURT:*  All right.  Don't answer any other
12  questions.  No matter what the question is, don't answer it.
13  Okay.  I'm going to excuse you.
14       *PROSPECTIVE JUROR:*  Okay.
15       *THE COURT:*  Have a seat.
16     *(No. 41 left the bench.)*
17       *THE COURT:*  Those are all the hands I saw.
18       *MS. BRADLEY:*  Yeah.
19       *THE COURT:*  Have a seat.
20    *(Proceedings at the bench concluded.)*
21       *THE COURT:*  Finally, I want to cover two brief matters
22  with you.  I'm going to let the lawyers ask you some questions
23  now.  What we're looking for in a trial is a fair and impartial
24  juror.  And what I mean by a fair and impartial juror is a
25  juror who will listen carefully to all of the evidence and who

1    will base his or her decisions only on the evidence admitted

2    during this trial and will follow the Court's instructions

3    concerning the law.

4                Now, that definition necessarily means that a

5    fair and impartial juror will not be influenced by any

6    preconceived notions about trials in general or criminal trials

7    in particular, that you won't be influenced by your experiences

8    as a citizen.  You'll only be influenced by the evidence in

9    this trial.  And it also means that you will follow my

10   instructions concerning the law.  I will give you instructions

11   at the beginning of the case.  I've already given you a few.

12   And at the end of the case I will give you detailed

13   instructions that you should apply in arriving at your verdict.

14                A fair and impartial juror will carefully and

15   conscientiously follow the Court's instructions and will not be

16   influenced by any notions about what the law is or what the law

17   ought to be, but instead will follow the Court's instructions.

18                Now, let me tell you a little bit about our

19   schedule.  We will hold court Monday through Friday of this

20   week, and we'll stop about 4:30 every day.  We start about 8:30

21   and we'll take off Labor Day, which is the following Monday and

22   then we should conclude by the following Friday.  We'll take a

23   lunch break and a break in the morning and a break in the

24   afternoon.  My goal is to have six hours of evidence a day,

25   because I found over the years that most jurors would prefer to

1   work fewer days, if the days were somewhat longer.  So we try

2   to have six hours in the courtroom, hearing testimony every

3   day.

4              Unless anyone has a question about my

5   instructions or my questions, I'm going to let the government

6   spend 15 minutes asking additional questions.  Anybody have any

7   questions or concerns?

8              Does anybody feel for whatever reason, based on

9   the brief description I've given you about this case, that if

10  you were selected as a juror, you could not be fair and

11  impartial, as I've just described that term?  Anybody feel that

12  way?  All right.

13             Yes, ma'am, on the front row.  Would you please

14  come up to the microphone here so we can hear you.

15             *PROSPECTIVE JUROR:*  Yes.  When I first came to this

16  country, I worked for a clinic.  They were advertising -- I'm a

17  physician.  And they were advertising for somebody to work at

18  the clinic.  And it turned out to be -- they were sort of

19  pushing methadone.  I actually walked out after seeing a single

20  patient, and that clinic closed down.  That was many years ago,

21  about 30 years ago.

22             And the other thing is that I see things being

23  billed for that are not -- well, I have over time --

24             *THE COURT:*  You think what?

25             *PROSPECTIVE JUROR:*  Things that are being --

1    procedures and things that sometimes get billed for that are

2    not actually performed.

3         THE COURT:  How do you know about that?  What makes

4    you think that?

5         PROSPECTIVE JUROR:  Well, because sometimes I get

6    something and it's a little bitty biopsy and the procedure is

7    stated as, you know, a much bigger procedure.

8         THE COURT:  Why don't you come up to the bench, so I

9    can ask you more detail.  Just come around here, ma'am, please.

10        *(The following proceedings were at the bench:)*

11        THE COURT:  How do you do, ma'am?  You're Juror No. 6?

12        PROSPECTIVE JUROR:  Yes, XXXXXX XXXXX.

13        THE COURT:  Would you tell me your name, please.

14        PROSPECTIVE JUROR:  XXXXXX XXXXX.

15        THE COURT:  And you are a physician?

16        PROSPECTIVE JUROR:  Yes.

17        THE COURT:  What area do you specialize in?

18        PROSPECTIVE JUROR:  Pathologist.

19        THE COURT:  Have you had situations where you thought

20   Medicare did not handle a claim correctly?

21        PROSPECTIVE JUROR:  No.

22        THE COURT:  Well, what are you --

23        PROSPECTIVE JUROR:  No, what I mean is when sometimes

24   procedures are done and it will say -- I'll give you an

25   example.  It will say "polypectomy" and resection of something

1   or other, and all I did was a teeny-weeny biopsy.  So in other

2   words, I've seen things made bigger than they really are just

3   to get more reimbursement.  I had a nephew who had an ingrown

4   toenail, for example, and they billed for two procedures, for

5   taking out the ingrown toenail on each side.

6               I'm very passionate about the fact that insurance

7   companies are not aware that people manipulate the coding and

8   the billing.

9        *THE COURT:*  Well, the physician or the doctor or the

10   hospital does the coding, don't they?

11       *PROSPECTIVE JUROR:*  Yes, they do.

12       *THE COURT:*  So you think the doctors and the

13   physicians --

14       *PROSPECTIVE JUROR:*  Not -- I'm just saying that in

15   general, everybody in medicine -- I know it sounds terrible,

16   because I am a doctor, but I just see a lot of -- everybody

17   wants to get as much as possible out of a particular procedure

18   and there are ways of magnifying --

19       *THE COURT:*  How do you think that would affect your

20   ability to be fair and impartial in this case?

21       *PROSPECTIVE JUROR:*  Well, because I think that people

22   try to bill for things that are not done --

23       *THE COURT:*  Well, you heard my instruction, the

24   defendant is presumed to be innocent.

25       *PROSPECTIVE JUROR:*  Yes, I do.

1      *THE COURT:*  Can you follow that instruction?

2      *PROSPECTIVE JUROR:*  I think I will have trouble,

3 especially because of my experience at that clinic that I just

4 described.

5      *THE COURT:*  So you think the defendant was probably

6 overcharging Medicare?

7      *PROSPECTIVE JUROR:*  It will be hard for me to be

8 totally impartial, I think.

9      *THE COURT:*  All right.  Have a seat.  Don't answer any

10 other questions.  No matter what the question is, don't -- do

11 you have something?

12      *MR. ESSMYER, SR.:*  No, Your Honor.  Is she No. 6 or

13 No. 7?

14      *THE COURT:*  Six.

15      *PROSPECTIVE JUROR:*  Six.

16      *MR. ESSMYER, SR.:*  You're Dr. XXXXX?

17      *PROSPECTIVE JUROR:*  Yes.

18      *THE COURT:*  Thank you, Doctor.  Have a seat.

19    *(No. 6 left the bench.)*

20      *MR. ESSMYER, SR.:*  She'll be for cause, Your Honor?

21      *THE COURT:*  Yeah.

22    *(Proceedings at the bench concluded.)*

23      *THE COURT:*  All right.  Anybody else who feels for

24 whatever reason that he or she could not be fair and impartial

25 as a juror?  All right.

1          I'll allow the government 15 minutes for

2     additional questions.

3          MS. FRAZIOR:  Thank you, Your Honor.

4          Good afternoon.  My name is Adrienne Frazior.

5     I'm a special assistant United States attorney, along with

6     Suzanne Bradley, who's also a special assistant United States

7     attorney.  That means that we're class-designated as both state

8     prosecutors and federal prosecutors, and we specialize in

9     health care fraud.

10         THE COURT:  Can you speak up?  I can't hear you,

11    because your back is to me.

12         MS. FRAZIOR:  Yes.  The single most important thing

13    for you to remember about this case is that it's a criminal

14    case and the defendant is presumed innocent until proven guilty

15    beyond a reasonable doubt.  That's my burden.  That's something

16    that the Judge spoke to you about previously, but I just want

17    to make sure we're all on the same page about that.

18         You cannot find the defendant guilty until you

19    have heard all the evidence in this case.  Given that, Juror

20    No. 2, if I asked you to render a verdict right now, what would

21    it be?

22         PROSPECTIVE JUROR:  Not guilty.

23         MS. FRAZIOR:  Not guilty.  That's right.  Does

24    everyone understand, it has to be not guilty because you've --

25    excuse me -- you've heard no evidence?  Okay.

1          As the Judge also said, the other thing we're

2    trying to do here is find 12 people who are fair and impartial.

3    Now, I know no one thinks of themselves as impartial or biased,

4    but we all have things in our background that make it a little

5    difficult for us to be -- to remove ourself from the situation

6    and just make a fair assessment.

7          So when I ask you some questions, I need you to

8    raise your hand up high.  I'm not trying to pry into your life,

9    but I do need to know some specific things.

10          The first thing, is that this is a health care

11    fraud case, and you've probably heard about health care in the

12    news.  It's a hot topic these days.  Is there anyone here who

13    feels that medical assistance or services should not be

14    provided to the elderly, the disabled, or the needy, just for

15    whatever reason?  You don't have to explain.  Raise your hand

16    if you feel that way.

17          I'm not seeing any hands.  Okay.

18          The next thing about this case is the Judge told

19    you that the defendant has been charged with soliciting

20    beneficiaries through a conspiracy to commit -- excuse me,

21    conspiracy to pay kickbacks as part of the Medicare/Medicaid

22    program.  Under federal law, a Medicare provider is not allowed

23    to pay an individual, a nonemployee to refer beneficiaries to

24    them in order to bill Medicare/Medicaid for services.

25          Is there anyone here who does not think that

1    should be the law?  If you need me to say it again, just me let

2    know.

3                 Does anyone here think that it should not be the

4    law, that it's illegal to solicit beneficiaries?

5                 Okay.  I don't see any hands.

6                 As you know, it is a federal case.  It's a

7    criminal case.  There will be a lot of witnesses who are law

8    enforcement.  I have a two-part question on this one.  The

9    first portion is, is there anyone who's had a negative

10   experience with law enforcement, such that you would not be

11   able to listen fairly and impartially to the testimony of a law

12   enforcement officer?  Anyone?

13                I know we've all had some experiences with law

14   enforcement.  It could be positive or negative.  I'm not seeing

15   any hands.  All right.

16                And the flip side of that is, is there anyone who

17   has such positive feelings for law enforcement?  Maybe you,

18   yourself, or a family member is a member of law enforcement,

19   that you would not be able to set that aside and fairly judge

20   their testimony.  Stated another way, if this were a race and

21   all of the witnesses were lined up, you would put the law

22   enforcement a little bit ahead.  Is there anyone who feels that

23   way, because of a family member or a friend or you, yourself?

24                Okay.  Juror No. 5, do you have any members of

25   your family that are in law enforcement?

1          *PROSPECTIVE JUROR:*  No, ma'am.

2          *MS. FRAZIOR:*  Juror No. 7, do you have anybody in your

3  family or friends that are law enforcement?

4          *PROSPECTIVE JUROR:*  No.

5          *MS. FRAZIOR:*  Anybody else?  I know this is a question

6  that you answered on the jury questionnaire, but it's just

7  good -- yes, No. 9?

8          *PROSPECTIVE JUROR:*  My father is a retired police

9  officer.

10          *THE COURT REPORTER:*  Can he stand up?

11          *MS. FRAZIOR:*  Can you stand up, sir?  You said your

12  father was a retired law enforcement officer?

13          *PROSPECTIVE JUROR:*  Right, retired police officer.

14          *MS. FRAZIOR:*  Okay.  And do you think that that

15  relationship would make it difficult for you to either listen

16  to a law enforcement witness or that you might put them a

17  little bit ahead in any way?

18          *PROSPECTIVE JUROR:*  No.

19          *MS. FRAZIOR:*  Okay.  Thank you.

20              Anybody else?  Number 33?  Stand up, sir.

21          *PROSPECTIVE JUROR:*  My brother-in-law is a deputy

22  sheriff, and my nephew is a chief of police.

23          *MS. FRAZIOR:*  Okay.  And do you feel that that would

24  influence you?

25          *PROSPECTIVE JUROR:*  No.

1          MS. FRAZIOR:  Okay.  All right.

2          THE COURT:  There's a hand.  There's a hand.

3          MS. FRAZIOR:  Who else?  Can you stand and just state

4    who it is in your family that's in law enforcement?

5          PROSPECTIVE JUROR:  Yes, I have a nephew that's a

6    police officer in Louisiana.

7          MS. FRAZIOR:  And do you feel that that would

8    influence your decision in this case in any way?

9          PROSPECTIVE JUROR:  No.

10         MS. FRAZIOR:  Okay.  And what is your number, ma'am?

11   Number 25?

12         PROSPECTIVE JUROR:  Right.  My son is a police

13   officer, but it wouldn't affect me.

14         MS. FRAZIOR:  Okay.  Thank you.

15             And, yes, what is your number?

16         PROSPECTIVE JUROR:  My brother-in-law is a former

17   police officer, and it wouldn't affect me.

18         MS. FRAZIOR:  Thank you.  And that was 39.

19             All right.  This case -- in this case the

20   government may call a cooperating witness.  That is somebody

21   who has been charged with a crime and who is coming in to

22   testify and provide the information that they know.  Is there

23   anybody here who feels that that should not be allowed, that

24   the government should not be able to rely on the testimony of

25   cooperating witnesses or that if you heard that witness

1  testify, that you would not be able to believe something that

2  they said because they're cooperating with the government?

3           Does anybody need any clarity on that, what that

4  means?

5           Sure.  Yes, No. 15.

6       PROSPECTIVE JUROR:  It depends on whether or not he's

7  getting anything out of it.

8       THE COURT:  Can you come up to the microphone, sir.

9  I'm having trouble hearing you.

10       PROSPECTIVE JUROR:  It depends upon whether the

11  witness is getting anything out of it, they're giving him

12  something to testify.  If it's just --

13       MS. FRAZIOR:  If they're receiving some sort of

14  benefit?

15       PROSPECTIVE JUROR:  Right.

16       MS. FRAZIOR:  Certainly.  And if you wait to hear the

17  full circumstances of any benefit offered, do you think you

18  would be able to fairly judge that credibility of that witness?

19       PROSPECTIVE JUROR:  Yes, ma'am.

20       MS. FRAZIOR:  If you have that information?

21       PROSPECTIVE JUROR:  Yes.

22       MS. FRAZIOR:  Thank you.

23           Raise your hand for me, all of you that agree

24  with that.  Pretty much the majority.  Okay.

25           Number 11, do you disagree with that?

1          PROSPECTIVE JUROR:  I don't think -- I'd need to hear

2     what kind of benefit.

3          MS. FRAZIOR:  Okay.  If you heard from a cooperating

4     witness, though, would you be able to judge their credibility

5     the same as all the other witnesses in this case?

6          PROSPECTIVE JUROR:  I think so.

7          MS. FRAZIOR:  All right.  Thank you.

8               Now, does everyone understand that the law does

9     not require the United States to bring every single witness who

10    may have some bit of personal knowledge about this case to come

11    testify?  Does everyone understand that that is the law?

12              Is there anyone here who says, I don't think I

13    can render a verdict of guilty if I didn't hear from every

14    single person who had knowledge?

15              I know, and you shake your heads, but I just want

16    to make sure that everybody understands the process and what

17    the law is.  Okay?

18              And, you know, one other thing I want to talk to

19    you about briefly is some of the ways we see law portrayed on

20    television.  We see it on CSI.  We see it on Law and Order.

21    But you know from what the Judge has told you, that this is a

22    document case.  It's fact intensive.  You'll hear from

23    witnesses.

24              Is there anyone here who says, If I don't see

25    fingerprints, I can't convict?  If I don't see DNA samples, I

1    can't convict?  Raise your hand, because if you feel that way,
2    well, that's okay, too.  Nothing else?  Okay.
3              And, lastly, are there any members of the panel
4    who know each other, are either neighbors or friends or work
5    together?  No?  All right.
6              And, finally, is there anyone who says, "You
7    know, if she had just asked me that one question, she would
8    know I was not right for this jury"?
9              Is there anybody who has anything that they just
10   want to volunteer that they think that we should know about, in
11   order to pick the fairest and most impartial jury?
12             *PROSPECTIVE JUROR:*  Can you repeat that again, please?
13             *MS. FRAZIOR:*  Yes.  I'm asking if there's anything
14   else in your life or your history that you would like to offer,
15   that if I knew it, I would know that you were not a right juror
16   for this case.
17             Yes, ma'am, No. 17.
18             *PROSPECTIVE JUROR:*  My -- in my culture, I'm Hispanic,
19   and usually the way we -- in my case, I'm raised, is that if
20   you are in court, it's because you did something wrong.  And we
21   are also told that police officers are there to protect us.  So
22   I'm already kind of like looking at them a little bit higher.
23             *MS. FRAZIOR:*  All right.
24             *PROSPECTIVE JUROR:*  I don't know if that's something
25   or not --

1          *MS. FRAZIOR:*  Well, certainly everybody here is
2    curious about what's going on in this case, right?  But you've
3    heard no evidence yet --
4          *PROSPECTIVE JUROR:*  No.
5          *MS. FRAZIOR:*  -- right?  And you understand that at
6    this point, that a verdict in this case right now would have to
7    be not guilty, and that's because the defendant is presumed
8    innocent.  Do you understand that?
9          *PROSPECTIVE JUROR:*  Yes, ma'am.
10          *MS. FRAZIOR:*  Would you be able to put those other
11    ideas aside and render a verdict in this case based solely on
12    the evidence heard in this courtroom?
13          *PROSPECTIVE JUROR:*  Yes.
14          *MS. FRAZIOR:*  All right.  Just to restate, do you
15    understand that the burden is upon the United States to prove
16    their case beyond a reasonable doubt and unless and until the
17    United States proves that, you cannot render a verdict of
18    guilty?
19          *PROSPECTIVE JUROR:*  Correct.
20          *MS. FRAZIOR:*  You understand.  Thank you.
21              Anything else?  All right.  Thank you very much.
22          *THE COURT:*  All right.  Mr. Essmyer?
23          *MR. ESSMYER, SR.:*  This is the only time that the
24    lawyers get to talk directly to the panel, to the people who
25    are going to be the deciders in the case.

 1          *THE COURT:*  Can you speak up a little?

 2          *MR. ESSMYER, SR.:*  Yes, Your Honor.  One of the things

 3  is, if you can't hear me, if you would raise your hand and tell

 4  me you can't hear me.  That's the first thing.

 5              Yes, sir, No. 20.

 6          *PROSPECTIVE JUROR:*  Can you speak up a little bit

 7  louder, because I've got some hearing problems.

 8          *MR. ESSMYER, SR.:*  Okay.  That's fine.

 9              The government just asked about cooperating

10  witnesses.  This is a case where there is going to be evidence

11  of fraud, Medicare/Medicaid fraud and Social Security fraud.

12  The person that the government is talking about, Ms. Carla

13  Parnell, is a person who has already pled.

14          *MS. FRAZIOR:*  Your Honor, the United States objects to

15  the defense attorney going into facts of the case before the

16  jury.

17          *MR. ESSMYER, SR.:*  I'll restate it, Your Honor.  The

18  cooperating person has already pled.  Is there anybody in the

19  first row, for instance, we'll start with the first row, who if

20  there's one person in a small company believes that everybody

21  in that small company must be guilty?

22              Anybody in the first row?  Anybody in the second

23  row?  Anybody in the third row?  The fourth row?  And the fifth

24  row?

25              And right at the moment, we're not really

1    ignoring you, we just have to focus over here.

2              All right.  Is there anybody in the first row who

3    would automatically believe that if you were the owner of a

4    small company that was involved in Medicare and Medicaid fraud,

5    you automatically have to be guilty?

6              Number ten, your name is?

7         *PROSPECTIVE JUROR:*  XXXX XXXXXXXX.

8         *MR. ESSMYER, SR.:*  XXXX XXXXXXXX.  What do you think

9    about that issue?  Is a small business owner always guilty if

10   somebody steals from them or is stealing from others?

11        *PROSPECTIVE JUROR:*  No, I don't believe so.

12        *THE COURT:*  When a person answers, would he or she

13   please stand so that we can see.  I heard you, but it will be

14   helpful if you stand up and speak.

15        *MR. ESSMYER, SR.:*  Would you have a little bias or

16   prejudice against an owner if the company was committing some

17   type of fraud?

18        *PROSPECTIVE JUROR:*  No, I wouldn't.

19        *MR. ESSMYER, SR.:*  And why is that?

20        *PROSPECTIVE JUROR:*  If the owner were not committing a

21   fraud or they were committing a fraud?

22        *MR. ESSMYER, SR.:*  I'm just asking you if you would

23   have a bias or prejudice before you heard any evidence about an

24   owner, where the company had committed fraud and there were

25   seven or eight or ten people, that was all that was in the

1    company?

2          PROSPECTIVE JUROR:  I don't think so.

3          MR. ESSMYER, SR.:  And then what I asked you was, why

4    not?

5          PROSPECTIVE JUROR:  Because they haven't been proven

6    guilty.  You don't know if they're guilty or not.

7          MR. ESSMYER, SR.:  All right.  One of the things that

8    the government asked you about also was, what's called

9    "kickbacks."  There are defenses to kickbacks.  A kickback is

10   if the doctor gets paid $15, for instance, to send a patient to

11   another doctor, that's illegal.  The defenses are called safe

12   harbors.  And the rules apply that you can give a commission to

13   an employee or an agent of a company, and that's not a

14   violation of kickback.

15               Number 3, Ms. XXXXXXXX --

16         PROSPECTIVE JUROR:  Yes.

17         MR. ESSMYER, SR.:  -- would you be prejudiced against

18   a defense that, hey, it's not really a kickback.  I'm paying my

19   employee because I thought it was legal under the defense of

20   safe harbor?

21         PROSPECTIVE JUROR:  No, I wouldn't be prejudiced.

22         MR. ESSMYER, SR.:  Mr. XXX?

23         PROSPECTIVE JUROR:  No. 2.

24         MR. ESSMYER, SR.:  How about you, could you look at

25   whatever the law is given to you by the Court and not be

1    prejudiced against a safe harbor that somebody thought would

2    allow them to do what they were doing?

3            *PROSPECTIVE JUROR:* Yes.

4            *MR. ESSMYER, SR.:* Okay. Ms. XXXXX --

5            *PROSPECTIVE JUROR:* Yes.

6            *THE COURT:* -- you were the manager of a therapist?

7            *PROSPECTIVE JUROR:* Yes, an office manager for four

8    months.

9            *MR. ESSMYER, SR.:* And how many people were in that

10   small therapist office?

11            *PROSPECTIVE JUROR:* Me and her.

12            *MR. ESSMYER, SR.:* There were two of you?

13            *PROSPECTIVE JUROR:* Yes.

14            *MR. ESSMYER, SR.:* Is it fair to say there were just

15   two of you, and you sometimes didn't know what the therapist

16   was doing?

17            *PROSPECTIVE JUROR:* Yes. And it was a long time ago.

18            *MR. ESSMYER, SR.:* All right. You don't think that

19   would bias or prejudice --

20            *PROSPECTIVE JUROR:* No.

21            *MR. ESSMYER, SR.:* -- you against anybody one way or

22   the other?

23            *PROSPECTIVE JUROR:* No.

24            *MR. ESSMYER, SR.:* Thank you. I was hoping it was

25   three or four at least.

1              *PROSPECTIVE JUROR:*  No, just two.

2              *MR. ESSMYER, SR.:*  And I mispronounced it last time,

3     so I'll just say No. 2.  Your wife worked as a medical

4     technologist.  What type of technologist was she?

5              *PROSPECTIVE JUROR:*  She's a laboratory technologist.

6              *MR. ESSMYER, SR.:*  Is there anything about her job or

7     being a technologist that would bias you or prejudice you

8     against a Medicare or Medicaid issue?

9              *PROSPECTIVE JUROR:*  No.

10             *MR. ESSMYER, SR.:*  Okay.  And Mr. XXXXXXXXX?

11             *PROSPECTIVE JUROR:*  XXXXXXXXX.

12             *MR. ESSMYER, SR.:*  XXXXXXXXX?

13             *PROSPECTIVE JUROR:*  Yes, sir.

14             *MR. ESSMYER, SR.:*  You went to A & M?

15             *PROSPECTIVE JUROR:*  I did, yes, sir.

16             *MR. ESSMYER, SR.:*  So you're from the Bryan/College

17    Station area -- or you were at the time?

18             *PROSPECTIVE JUROR:*  Yes, sir.

19             *MR. ESSMYER, SR.:*  And your brother was a CPA?

20             *PROSPECTIVE JUROR:*  My brother-in-law.

21             *MR. ESSMYER, SR.:*  Brother-in-law is a CPA?

22             *PROSPECTIVE JUROR:*  Is currently a CPA.

23             *MR. ESSMYER, SR.:*  Would anything about that

24    background, coming from a military traditional school like A &

25    M, which I went to also, or the fact that your brother-in-law

1   is a CPA, and CPAs require strict things, that would bias you

2   or prejudice you against a company, a small company that may

3   not have quite put the dots in all the places in the --

4           *PROSPECTIVE JUROR:*  No, I don't think so.

5           *MR. ESSMYER, SR.:*  All right.  You would listen to all

6   the evidence and reach a --

7           *PROSPECTIVE JUROR:*  I would have to hear the evidence,

8   yes, sir.

9           *MR. ESSMYER, SR.:*  Thank you.  Mr. XXXXXXX.

10          *PROSPECTIVE JUROR:*  Yes, sir.

11          *MR. ESSMYER, SR.:*  I saw that you had in the past

12  called in to report an offense that occurred in your presence;

13  is that fair, sir?

14          *PROSPECTIVE JUROR:*  Yes, sir.

15          *MR. ESSMYER, SR.:*  So you wouldn't have a bias or

16  prejudice against someone who made a report, for instance, to

17  Social Security or IRS about a crime that had been committed?

18          *PROSPECTIVE JUROR:*  A bias against?  No, sir.

19          *MR. ESSMYER, SR.:*  And, you know, a lot of times when

20  somebody reports a murder, the person that the police first

21  investigate is the person who investigators would call the

22  murderer.  Have you seen that on CSI, too?

23          *PROSPECTIVE JUROR:*  Yes, sir.

24          *MR. ESSMYER, SR.:*  But you would have no bias or

25  prejudice against the person who called in the crime?

1          *PROSPECTIVE JUROR:*  No, sir.

2          *MR. ESSMYER, SR.:*  Okay.  Ms. XXXXX.  And I see that

3    you, like I, are getting to the age where Medicare is an issue;

4    is that fair, ma'am?

5          *PROSPECTIVE JUROR:*  Yes, ma'am.

6          *MR. ESSMYER, SR.:*  You've heard of the fight against

7    Medicare and Medicaid fraud, correct?

8          *PROSPECTIVE JUROR:*  Correct.

9          *MR. ESSMYER, SR.:*  Would just the publicity that

10   you've heard about Medicare/Medicaid fraud bias you or

11   prejudice you in any manner, shape, or form against someone who

12   is charged with Medicaid/Medicare fraud?

13         *PROSPECTIVE JUROR:*  No, sir.

14         *MR. ESSMYER, SR.:*  Being someone who in one form or

15   another getting -- what is it, Medicaid or Medicare?

16         *PROSPECTIVE JUROR:*  Medicare.

17         *MR. ESSMYER, SR.:*  Medicare.  Would that bias you,

18   just the fact that you're one of the people that's being

19   defrauded, in a sense -- it's the government that's being

20   defrauded, but would that bias you or prejudice you in any

21   manner, shape, or form?

22         *PROSPECTIVE JUROR:*  I would hope not.

23         *MR. ESSMYER, SR.:*  Is there anybody on the jury who

24   just being on Medicare or Medicaid, that that would cause them

25   one way or another to be biased or prejudiced against somebody?

1              And I see no hands.

2              Let me see, I think I still have one more

3    question.  Do you know what a durable medical equipment is,

4    DME?

5              *PROSPECTIVE JUROR:*  I know what a durable power of

6    attorney is.

7              *MR. ESSMYER, SR.:*  Okay.

8              *PROSPECTIVE JUROR:*  So I don't know how closely

9    related those two things are.

10             *MR. ESSMYER, SR.:*  All right.  That's fine, ma'am.

11   Thank you.

12             Anybody in the first row know what DME is?  Yes,

13   sir.

14             *PROSPECTIVE JUROR:*  It's durable medical equipment,

15   like walkers, wheelchairs, is my understanding of it.

16             *MR. ESSMYER, SR.:*  All right.  And do you have any

17   background in supplying or buying or purchasing or helping

18   somebody purchase DME equipment?

19             *PROSPECTIVE JUROR:*  No.  But I have -- my mother is in

20   a nursing home, and so I see the equipment.

21             *MR. ESSMYER, SR.:*  Does your mother's -- when you go

22   and see the equipment and you talk to your mom -- I imagine she

23   uses it, right?

24             *PROSPECTIVE JUROR:*  Yeah.

25             *MR. ESSMYER, SR.:*  Does she tell you horror stories

1  about the equipment or anything like that?

2          PROSPECTIVE JUROR:  No, I haven't heard any.

3          MR. ESSMYER, SR.:  All right.  So your mother's

4  experience wouldn't bias or prejudice you one way or the other?

5          PROSPECTIVE JUROR:  No.

6          MR. ESSMYER, SR.:  All right.  Thank you, sir.

7              Anybody on the second row have any experience

8  with DME, durable medical equipment, or buying or selling it?

9  In the third row?  In the fourth row?  In the fifth row?

10             Anybody here ever gone out and purchased a

11  wheelchair or a scooter for their mother or dad or relative or

12  child?

13             And your number, ma'am, is?

14         PROSPECTIVE JUROR:  32.

15         MR. ESSMYER, SR.:  Can you come up here, because

16  you're so far back.  Thank you for coming up here.

17         PROSPECTIVE JUROR:  No problem.

18         MR. ESSMYER, SR.:  Can you tell us just the basis of

19  why you were getting a wheelchair for someone?

20         PROSPECTIVE JUROR:  Well, my mother was very old and

21  had trouble walking, so we were looking to get her a scooter,

22  you know, get that paid for through Medicare.

23         MR. ESSMYER, SR.:  And did you have any problems with

24  that process?

25             PROSPECTIVE JUROR:  Yeah.  Montgomery County, they

1   don't allow scooters to be purchased through Medicare, because

2   there was a lot of fraud.

3           MR. ESSMYER, SR.:  How do they stop that?

4           PROSPECTIVE JUROR:  They just tell you that you're not

5   eligible because you live in Montgomery County, at least that's

6   what they told us.  I don't know.  That's what they told us.

7           MR. ESSMYER, SR.:  If I can ask -- I guess I am going

8   to ask.  Who told you that?  Was it Medicare or Medicaid or

9   who?

10          PROSPECTIVE JUROR:  No, actually a provider.

11          MR. ESSMYER, SR.:  Who was a doctor?

12          PROSPECTIVE JUROR:  No, durable equipment --

13          MR. ESSMYER, SR.:  Provider?

14          PROSPECTIVE JUROR:  Uh-huh.

15          MR. ESSMYER, SR.:  Okay.  And has that experience

16  biased you or prejudiced you against people who may supply

17  scooters or wheelchairs?

18          PROSPECTIVE JUROR:  No.

19          MR. ESSMYER, SR.:  The fact that a whole county,

20  because of the rampant fraud in that area of wheelchairs and

21  scooters, does that bias or prejudice you?

22          PROSPECTIVE JUROR:  I thought it was unfair because my

23  mother needed it, but didn't prejudice me --

24          MR. ESSMYER, SR.:  But would that cause you --

25          PROSPECTIVE JUROR:  -- in this case.

 1              *MR. ESSMYER, SR.:*  -- to be prejudiced against

 2      somebody who's accused of Medicare fraud with wheelchairs and

 3      scooters?

 4              *PROSPECTIVE JUROR:*  No.

 5              *MR. ESSMYER, SR.:*  All right.  Thank you.  Besides

 6      number -- thank you, ma'am.

 7              *PROSPECTIVE JUROR:*  You're welcome.

 8              *MR. ESSMYER, SR.:*  Are you about to cry, ma'am?  I

 9      didn't mean to make you cry.

10              *PROSPECTIVE JUROR:*  No.  I have allergies.

11              *MR. ESSMYER, SR.:*  Go ahead, sir.

12              *PROSPECTIVE JUROR:*  Well, just a C-PAP machine for

13      myself through my medical provider.

14              *MR. ESSMYER, SR.:*  I'm sorry?

15              *PROSPECTIVE JUROR:*  You were asking if anyone had

16      actually been involved in a purchase --

17              *MR. ESSMYER, SR.:*  That's correct.

18              *PROSPECTIVE JUROR:*  -- or acquisition of DMEs, and I

19      think a C-PAP machine would probably count as that.

20              *MR. ESSMYER, SR.:*  Yes.

21              *PROSPECTIVE JUROR:*  And I acquired one a few months

22      ago for myself, my injuries.

23              *MR. ESSMYER, SR.:*  And did that -- would that

24      experience affect you in any manner, shape, or form?

25              *PROSPECTIVE JUROR:*  Not at all.  It was a very

1  positive experience actually.

2          *MR. ESSMYER, SR.:*  All right.  Who else do we have?

3  Number ten.

4          *PROSPECTIVE JUROR:*  I just rented a wheelchair for my

5  husband after a knee surgery.

6          *MR. ESSMYER, SR.:*  And is there anything about that

7  experience -- did you get it from a DME company?

8          *PROSPECTIVE JUROR:*  Yes.

9          *MR. ESSMYER, SR.:*  Can you explain how the rent

10  process went?  In other words, what do you do?

11          *PROSPECTIVE JUROR:*  I don't even know what he -- he

12  took care of that --

13          *MR. ESSMYER, SR.:*  He filled in the form?

14          *PROSPECTIVE JUROR:*  -- financial part of it, so I have

15  no idea.

16          *MR. ESSMYER, SR.:*  Okay.

17          *PROSPECTIVE JUROR:*  But it was a positive experience.

18  We just rented it for a month, because he couldn't be on his

19  foot at all and we have tile floors and so we just wanted to

20  make sure that he didn't fall on his knee.

21          *MR. ESSMYER, SR.:*  Thank you.

22              Yes, sir, No. 20?

23          *PROSPECTIVE JUROR:*  Yeah.  I use a C-PAP machine for

24  several years now.

25          *MR. ESSMYER, SR.:*  All right.  And you were the

1  gentleman who is a little bit hard of hearing?

2          *PROSPECTIVE JUROR:*  Yeah, I have a little tinnitus

3  here and it's kind of -- if you don't speak up, I have a hard

4  time following you.

5          *MR. ESSMYER, SR.:*  Would that bother you during a long

6  trial, a lengthy trial?

7          *PROSPECTIVE JUROR:*  I think it would.

8          *MR. ESSMYER, SR.:*  You think it would?

9          *PROSPECTIVE JUROR:*  Yes.

10         *MR. ESSMYER, SR.:*  Thank you very much, sir.

11              Number 15 --

12         *PROSPECTIVE JUROR:*  Yes, sir.

13         *MR. ESSMYER, SR.:*  -- have you ever had an experience

14  where you were betrayed by a friend?

15         *PROSPECTIVE JUROR:*  No, sir.

16         *MR. ESSMYER, SR.:*  No?  Okay.  That's the only

17  question we've got for you.

18              Number 18, how about you?  Have you ever had an

19  experience where you were betrayed by a friend?

20         *PROSPECTIVE JUROR:*  No, sir, not at all.

21         *MR. ESSMYER, SR.:*  All right.  Anybody ever had any

22  experience of being betrayed by a friend?  Go ahead.

23         *PROSPECTIVE JUROR:*  How about a spouse?  I don't know

24  if that qualifies as a friend or not.

25         *MR. ESSMYER, SR.:*  And I don't know whether I should

1   follow up on that.

2            PROSPECTIVE JUROR:  No, you don't need to.

3            MR. ESSMYER, SR.:  But you would agree with me that

4   lifelong friends or partners can betray one another?

5            PROSPECTIVE JUROR:  Right.

6            MR. ESSMYER, SR.:  All right.

7            THE COURT:  Mr. Essmyer, your time is about up.

8            MR. ESSMYER, SR.:  Is there anyone for any reason --

9   and I know that the Judge sort of asked this question, but I

10  want to know if you don't think you would be a fair and

11  impartial juror in a Medicare, Medicaid, Social Security fraud

12  case, would you please raise your hand now if there's anything,

13  even if, like, No. 20, whose hearing is a problem.  So if

14  there's a medical reason or you have a vacation of a lifetime,

15  any reason that you would not be a fair and impartial juror and

16  not be able to sit here for two weeks and listen to all of the

17  evidence before you make up your mind, would you please raise

18  your hand and we'll go up front and talk to the Court.

19            Thank you very much for your time.  I appreciate

20  it.  As I said before, this is the only time we get to talk to

21  you directly, and I appreciate your being truthful.

22            THE COURT:  Will counsel please approach the bench.

23        (The following proceedings were at the bench:)

24            THE COURT:  I've already excused for cause Nos. 6, 14,

25  and 41.  Are there any other challenges for cause?  I'll begin

```
 1   first with the government.

 2           MS. BRADLEY:  Your Honor, No. 21, I've highlighted

 3   this --

 4           THE COURT:  I can't hear you.  Can you speak up?

 5   Twenty-one?

 6           MS. BRADLEY:  Twenty-one.  I just noticed this --

 7           THE COURT:  She didn't say anything about it and I --

 8           MS. BRADLEY:  I know.  Did you see that, Michael?

 9           THE COURT:  Normally if they have any problem, they

10   bring it to my attention --

11           MS. BRADLEY:  Right.

12           THE COURT:  -- or they bring it to the people's

13   attention downstairs.

14           MS. BRADLEY:  Okay.

15           MR. ESSMYER, SR.:  I was going to ask that she come up

16   here, Your Honor.

17           THE COURT:  I don't want to embarrass.

18           MR. ESSMYER, SR.:  No, I mean, come up here, because I

19   was going to have 20 come up, also.

20           THE COURT:  No, you're not.

21           MR. ESSMYER, SR.:  That's fine, Your Honor.

22           MS. BRADLEY:  Okay.

23           THE COURT:  Well, do you want to challenge her?

24           MS. BRADLEY:  No, Your Honor.  I just wanted to point

25   it out.  I know she didn't say anything and she could have.
```

1           *THE COURT:*  You know, she didn't say anything
2  downstairs or up here.
3           *MS. BRADLEY:*  Okay.
4           *THE COURT:*  I think she's fine.
5           *MS. BRADLEY:*  All right.
6           *THE COURT:*  Any other challenges by the government?  I
7  mean, you're welcome to use a peremptory on her, but I'm not
8  going to excuse her.
9           *MS. BRADLEY:*  Okay.  All right.  Number 20, the man
10  that says he's hard of hearing.
11           *THE COURT:*  Pardon me?
12           *MS. BRADLEY:*  The hard of hearing -- the man that was
13  hard of hearing.
14           *THE COURT:*  Yeah, but you're going to use a
15  microphone.  If I can hear you, he can hear you.
16           *MS. BRADLEY:*  Okay.  All right.
17           *MR. ESSMYER, SR.:*  I agree with the government on No.
18  20, though, Your Honor.  Could we excuse him by agreement?
19           *THE COURT:*  It's up to you.  Do you want to excuse
20  him?
21           *MS. BRADLEY:*  Yeah, let's do.
22           *MS. FRAZIOR:*  Yes, Your Honor.
23           *THE COURT:*  Okay.  Twenty will be excused by
24  agreement.
25                    Any other by the defense?

1              MR. ESSMYER, SR.: Yes, Your Honor.  Number 17, the

2    Hispanic.  She said that because of her heritage, that when

3    somebody gets to this position in the court proceedings, that

4    something is wrong, and she would believe the police over any

5    other witness because of her heritage.

6              THE COURT:  Well, she also said that she could follow

7    the Court's instructions in being fair.  And the fact that a

8    person would tend to believe a police officer is not a basis

9    for excusing them, if they can follow the Court's instructions.

10   So that objection is denied.

11             MR. ESSMYER, SR.:  And that's Ms. XXXXX, Your Honor.

12             THE COURT:  Pardon me?

13             MR. ESSMYER, SR.:  That's Ms. XXXXX.

14             THE COURT:  I understand.  Any others?

15             MR. ESSMYER, SR.:  No, that's all I have, Your Honor.

16             MS. FRAZIOR:  No, Your Honor.

17             THE COURT:  Okay.  Have a seat.  Thank you.

18        (Proceedings at the bench concluded.)

19             THE COURT:  Ladies and gentlemen, we're going to now

20   complete the jury selection process.  It may take 20 minutes or

21   so.  So in a just a moment, I'm going to ask that you go back

22   out into the hall.  But please remain on the ninth floor.  We

23   have water fountains and rest rooms and anything that you might

24   need, so don't leave this floor.

25             Don't talk to anyone or allow anyone to talk to

1   you while you're out in the hall.  There may be witnesses or

2   there may be people from the media.  I have no knowledge of

3   who's out there, but as just a general precaution, don't talk

4   to anyone or allow anyone to talk to you.

5            We will call you back in when we're ready for

6   you.  Thank you.  You're excused.

7        *(Jury venire panel not present.)*

8            *THE COURT:*  All right.  Be seated, please.  Just a

9   moment.

10       *(Judge conferring with case manager.)*

11           *MS. BRADLEY:*  Your Honor, we have two jurors here.

12           *THE COURT:*  All right.  Come up, ma'am.

13               Will counsel please approach the bench.

14       *(The following proceedings were at the bench:)*

15           *THE COURT:*  How do you do?

16           *PROSPECTIVE JUROR:*  I'm fine.

17           *THE COURT:*  Please tell me your name and number.

18           *PROSPECTIVE JUROR:*  XXXX XXXX XXXXXXXXX, 81 (sic).

19           *THE COURT:*  Twenty-four.  Okay.

20           *PROSPECTIVE JUROR:*  I mean, 24, I'm sorry.

21           *THE COURT:*  What did you want to ask?

22           *PROSPECTIVE JUROR:*  What I want to know is that I'm

23  the only one that drives, and I drive my grandchildren to and

24  from school.  And my husband is a veteran and he goes to the

25  VA.  He has classes, like, Mondays, Tuesdays, and Fridays.  And

1    I'm the only one that can pick them up and take them to school.

2    And, also, I'm on medication for diabetes and blood pressure.

3         THE COURT:  Well, you didn't list any of this in your

4    questionnaire.

5         PROSPECTIVE JUROR:  I know.  I mean, I thought because

6    I had -- my husband asked me, "Are you finished with it," and I

7    said, "Yes," and I had gotten up to do something and --

8         THE COURT:  Well, you know, it says down here, "Is

9    there any other reason you can't serve," and you had "none."

10        PROSPECTIVE JUROR:  I -- no, I didn't write it.  I'm

11   still worried but --

12        THE COURT:  Well, why don't you go out in the hall,

13   and we'll decide what we're going to do.

14        PROSPECTIVE JUROR:  Because I'm a diabetic, and I'm

15   constantly having to go to the rest room.

16        THE COURT:  Okay.  Go out in the hall and we'll see

17   what we're going to do.

18        PROSPECTIVE JUROR:  Thank you.

19        THE COURT:  Thank you.

20      (Juror No. 24 left the bench.)

21        THE COURT:  Counsel, please come up.  Are you

22   agreeable to excuse 24 by agreement?

23        MR. ESSMYER, SR.:  Yes, Your Honor.

24        MS. FRAZIOR:  Yes, Your Honor.

25        THE COURT:  Okay.  Have a seat.

1          MS. FRAZIOR:  Thank you.

2          THE COURT:  Okay.  The following jurors have been

3     excused by agreement or for cause:  Number 6, No. 14, No. 20,

4     No. 24, and No. 41.  Forty-one is not really relevant because

5     he's beyond the zone.

6               We'll select 12 jurors and 2 alternates.  The

7     government will get 6 strikes for the 12 regular jurors.  The

8     defendant will get 10 strikes for the 10 -- for the 12 jurors.

9     Each side will get one strike for the two alternates.  So if my

10    math is correct, we'll select the 12 from Nos. 1 through 32 and

11    the alternates from 33, 34, 35, and 36.  Do you-all understand

12    how I did the arithmetic?

13         MR. ESSMYER, SR.:  The question -- the only question I

14    have for clarification, my one strike for the alternate will be

15    either 33, 34, 35, or 36?

16         THE COURT:  That's right.

17         MR. ESSMYER, SR.:  And, otherwise, I keep going on the

18    ten?

19         THE COURT:  Pardon me?

20         MR. ESSMYER, SR.:  Otherwise, it's the first 32?

21         THE COURT:  Yeah, you have 10 strikes for the first

22    32, and the government has 6 for the first 32.  Everybody

23    clear?

24         MS. BRADLEY:  Yes.

25         MS. FRAZIOR:  Yes, Your Honor.

1    *THE COURT:*  Okay.   Andrew, are you clear on the --

2    *THE CASE MANAGER:*  Yes, Your Honor.

3    *THE COURT:*  Does the math make sense to you?

4    Okay.   Please give Mr. Boyd your strikes when

5    you're ready.  Try to do it in about 15 minutes, if you can.

6    *(Recess from 2:40 p.m. to 2:55 p.m.)*

7    *(Open court, defendant present, jury venire panel not*

8    *present.)*

9    *THE COURT:*  Be seated, please.

10   Have you given the defense your first day's

11   witnesses?

12   *MS. FRAZIOR:*  We have, Your Honor.  We did have one

13   change, and we'll let them know about that as soon as possible.

14   We think it's just going to be Eleanor Brown and then Sharon

15   Thompson.

16   *THE COURT:*  I do encourage you to use the microphones,

17   because that's the first question most jurors have, they send

18   back, is, "We can't hear the lawyers."

19   *MS. FRAZIOR:*  All right.

20   *MR. ESSMYER, SR.:*  Your Honor, we've discussed using

21   the podium.  And with the Court's permission, the podium could

22   be placed wherever the -- by the lawyer who is using it, if

23   that is all right with the Court.

24   *THE COURT:*  I don't care.  As long as the jury can

25   hear you and I can hear and see you, I don't care where you put

1  it.

2          MS. BRADLEY:  Is there a mike on the podium?

3          THE COURT:  No.

4          MS. BRADLEY:  Okay.

5          THE COURT:  You could take that hand mike, I guess,

6  and put it next to the podium.  But if you put the podium in

7  this area, the court reporter and the jury and I can generally

8  hear you fine.

9          MS. BRADLEY:  All right.  That's what we'll do.

10             And, Your Honor, before the jury comes in, I

11  think we've reached some agreements on some exhibits that are

12  going to be admitted.  For clarity, can we go through it right

13  now, what's been agreed as being --

14          THE COURT:  I think we can do it some other time.

15          MS. BRADLEY:  All right.

16          THE COURT:  If you agree, what I would normally

17  suggest is when you intend to use the exhibits with the

18  witness, just say, "Your Honor, we intend to use so-and-so with

19  this witness.  The defense has no objections, and we offer them

20  now."

21          MS. BRADLEY:  Okay.

22          MR. ESSMYER, SR.:  And, Your Honor, may I have

23  permission to come and go, cross over there so I can see the

24  witness in trial?

25          THE COURT:  Sure.  Sure.

1          To answer your question, we'll work Friday.

2  Nobody had a problem with Friday.

3          MR. ESSMYER, SR.:  Yes, Your Honor.

4          THE COURT:  What did I tell you, 15 minutes for

5  opening statements?

6          MS. FRAZIOR:  You told us 20.

7          THE COURT:  Okay.

8      (Jury venire panel present.)

9          THE COURT:  Please be seated, ladies and gentlemen.

10          Ladies and gentlemen, if your name is called,

11  please come forward and take a seat up here in the jury box.

12          THE CASE MANAGER:  XXXX XXXXXX XXX --

13          THE COURT:  What's his number?

14          THE CASE MANAGER:  -- Juror No. 2; Juror No. 3, XXXXX

15  XXX XXXXXXXX; Juror No. 7, XXXXXXX XXXXX XXXXXXX; Juror

16  No. 10, XXXX XXXXXXXX XXXXXXXX; Juror No. 12, XXXXXXX XXX

17  XXXXXX; Juror No. 13, XXXXX XXXXX XXXXXXXXXX; Juror No. 15,

18  XXXXXXX XXXX XXXXXX; Juror No. 16, XXXXXX XXXXXXXX; Juror

19  No. 18, XXXXXXXX XX XXXXXXXXX; Juror No. 19, XXXX XXXXXXXX

20  XXXX; Juror No. 26, XXXXX XXXX XXXXXXX; Juror No. 28, XXXXXXX

21  XXXXX XXXXXXXXX; Juror No. 34, XXXXXX XXXXXXXXXXXX; Juror

22  No. 36, XXXXXX XXXX XXXXXXXXX.

23          THE COURT:  Will counsel please approach the bench.

24      (The following proceedings were at the bench:)

25          THE COURT:  Is there any objection to the jury as

1  constituted?

2           *MR. ESSMYER, SR.:*  No objection, Your Honor.

3           *MS. FRAZIOR:*  No, Your Honor.

4           *THE COURT:*  All right.  Have a seat, please.

5      *(Bench proceedings concluded.)*

6           *THE COURT:*  Ladies and gentlemen of the jury, would

7  you please stand and raise your right hand and be sworn as

8  jurors.

9      *(Jurors sworn.)*

10          *THE COURT:*  Please be seated.  Thank you.

11              At this time I want to excuse those of you who

12 were not selected.  I know you've been down here all day.  We

13 appreciate your cooperation and your patience.  Obviously we

14 could not have selected the jury without your participation in

15 this process.  So each of you has, in fact, provided a valuable

16 service to our system of justice and I and the attorneys and

17 the parties appreciate it.  You are now excused.

18              Ladies and gentlemen of the jury, if you will

19 please look this way, I'm going to give you some initial

20 instructions.

21              Your job is to listen carefully to the evidence

22 and to base your decision on the evidence in this case.  There

23 are, in effect, two judges.  I am a judge.  My role is to rule

24 on issues dealing with the admissibility of evidence and at the

25 conclusion of the case to instruct you on the law that applies

1   to your deliberations.  You are the judges of the facts.  Your

2   job is to listen carefully to all of the evidence, observe the

3   demeanor of the witnesses, consider any exhibits, and at the

4   end of the case, decide whether the government has proved the

5   charges against the defendant beyond a reasonable doubt.

6            I remind you the defendant is presumed to be

7   innocent.  The presumption of innocence remains with the

8   defendant until such time, if ever, that the government proves

9   the defendant's guilt.  Because the defendant is presumed to be

10  innocent, she has no obligation to call any witnesses, to

11  present any evidence or to testify.  And should she elect not

12  to call any witnesses or not to testify, you should not draw

13  any adverse inference from that fact, because she's only doing

14  what the law expressly permits her to do.

15           The evidence in the case will come through the

16  sworn testimony of witnesses and any exhibits that I admit.  A

17  significant part of your job will be considering and evaluating

18  the credibility or believability of what each witness says.

19  The statements and arguments of lawyers are not evidence.

20           In just a moment I'll allow each side to make an

21  opening statement.  An opening statement is an argument by the

22  lawyer setting out what the lawyer believes the evidence will

23  be.  Later you will actually hear the evidence.

24           At the conclusion of all the evidence, the

25  lawyers will argue what they believe the evidence has

 1   established.  You will retire to the jury room, select your

 2   foreperson, and reach your verdict.

 3              There are certain rules that apply in every case.

 4   There are rules that govern my conduct and the conduct of the

 5   witnesses and the conduct of the attorneys.  There are certain

 6   rules that apply to you.  They're brief in number, but I want

 7   to emphasize them with you.

 8              During the trial you should not discuss this case

 9   with anyone or allow anyone to discuss the case with you.  When

10   you arrive at your home tonight, it's human nature that friends

11   or family members may ask you about the case.  You should

12   politely say, "When the case is over, I'll tell you all about

13   it, but right now the judge instructed me not to talk about

14   it."  And the reason is, when you think about it, based on

15   common sense, if you tell a friend or family member about what

16   a witness said, it's human nature for them to tell you what

17   they think.  But they haven't been here observing the witness.

18   They don't know anything about the case.  So you're not to be

19   influenced by what other people think about the case.

20              Secondly, do not read or listen to any mention of

21   the case should there be any in the media.  You should base

22   your decision only on the evidence admitted during the trial.

23              Also, I know many of you have cell phones,

24   BlackBerrys, use the Internet, and other technology devices.

25   You must not communicate with anyone electronically about the

case.  You may not communicate through your cell phone, e-mail, BlackBerry, iPhone, text messaging, or Twitter.  I don't even know what Twitter is, but you're not to use it.  Okay?  Or through any blog or Web site, including Facebook, Googling, Myspace, LinkedIn, YouTube, or any other social technology device.  The bottom line is just don't friend anybody about this case.  Okay?  Don't talk to anyone about the case or allow anyone to talk to you.  And I'm serious about that.  There have been juries in other states that we had to start -- the judge had to start all over again because somebody was texting about the case or going on the Internet to do research about the case.  You should base your decision in this case only on the evidence admitted during this trial.  You should not do any research or investigation concerning the case.

In just a moment the lawyers will make an opening statement.  After the opening statement, I'm going to ask that you retire to the jury room and pick up your badges and then I'll give you some further instructions.

The government may now make its opening statement.

MS. FRAZIOR:  Thank you, Your Honor.

You know that this is a health care fraud case and it involves Medicare and Medicaid, but it also involves taking advantage of some of the most vulnerable people in our society, Medicare and Medicaid beneficiaries.

1           The defendant owned and operated a durable
2   medical equipment company from 2003 to 2009 in Bryan, Texas.
3   The name of that company was Yellabone Medical Equipment.
4           Now durable equipment, as we talked a little bit
5   in the voir dire, is equipment that is designed for repeated
6   use, walkers, canes, things like that, that help people on a
7   day-to-day basis and they're repeatedly used.
8           Medicare witnesses in this case will tell you
9   that the way a durable medical equipment provider and Medicaid
10  is supposed to work is like this:  The beneficiary goes to
11  their doctor.  They receive a prescription.  They take that
12  prescription to their medical equipment supplier.  And the
13  medical equipment supplier provides them the equipment, and
14  they bill Medicare and Medicaid.  That is not the way it worked
15  in this case.
16          In this case the defendant and her employees
17  solicited beneficiaries, went door to door in low income areas,
18  and did anything they could to obtain beneficiary information
19  so that they could bill Medicare and Medicaid.
20          Now, in order to become a Medicare and Medicaid
21  provider, an individual has to fill out an application.  They
22  make certain certifications in that application, saying things
23  like, "I will not commit fraud.  I will not submit false
24  claims.  I will actually provide the equipment that I am
25  swearing that I'm providing."  But that is not what happened

1    here.

2              The defendant in this case routinely bought from

3    vendors cheap, used equipment, and sometimes no equipment at

4    all, and then she billed Medicare and Medicaid for expensive

5    new equipment.  Clearly a violation of the Medicare rules and

6    regulations and a violation of those certifications that she

7    signed when she became a Medicare provider.

8              You will hear from certain beneficiaries.  You'll

9    hear from Eleanor Brown.  She's the mother of Jisha Brown, a

10   37-year-old woman, who has cerebral palsy.  Eleanor will tell

11   you that she contacted Yellabone to get a special sized

12   wheelchair for her daughter.  She needed a wheelchair that

13   could hold her daughter upright, because her spine is curved in

14   such a way that she can't hold herself up.  Eleanor gave this

15   information to the defendant and she told her she needed a

16   headrest, the straps, all the things that would help Jisha on a

17   daily basis be able to be mobile in their home and out in the

18   community.  But what she received in return was not that

19   wheelchair.  What she received in return was a plain old

20   wheelchair, no straps, no headrest.

21             Come to find out later, the defendant billed

22   Medicare and Medicaid for that particular wheelchair, the one

23   with all the things she had not provided to the defendant -- I

24   mean, excuse me, to Jisha Brown.  Jisha's mother will tell you

25   that because she couldn't get that wheelchair, Jisha wasn't

1  able to get around the house.  She had to use a shower chair

2  with wheels on it that actually did have the straps, to go

3  throughout the house.  She couldn't leave the house and go to

4  the park.  She couldn't do any of the things that she normally

5  would be able to do if she had had the correct equipment, and

6  that's because Jisha's mother trusted the defendant in this

7  case.

8            You'll hear from other beneficiaries who will

9  tell you varied stories.  They'll tell you about their

10 interactions with the defendant.  One thing that will be a

11 consistent theme from all of the beneficiaries is that they did

12 not get the equipment that the defendant billed Medicare and

13 Medicaid for.

14           You will also hear from employees in this case.

15 You'll hear from Rosia Benford.  She'll tell you that she was a

16 receptionist for the defendant, and it was her job to field --

17 excuse me, field angry phone calls from beneficiaries who were

18 constantly calling saying, "Where are my supplies?  Where are

19 the things that you promised that you were going to provide to

20 me?"

21           She'll also tell you that it was her job to hound

22 the doctors, to constantly send requests to them over and over

23 and over again, to try and get prescriptions from them so the

24 defendant could bill Medicare and Medicaid for supplies that

25 she likely would never provide.

1          Rosia will tell you and other employees in this

2   case will tell you, when they brought these things up to the

3   defendant's attention, the defendant said, "This is my

4   business.  I run it how I run it."

5          You will also hear from Carla Parnell.  She's

6   another former employee and someone who is in charge of the

7   billing in this case.  She is a cooperating witness.  She was

8   charged in this case and she has pled guilty in this case.

9          You will also hear about the terms of her

10  agreement.  And you will understand what she was promised, if

11  anything, from the United States in order for her testimony in

12  the trial.

13         Carla will tell you that she was instructed to

14  commit and to submit false claims to Medicare and Medicaid in a

15  number of ways.  First, the defendant gave her a list of folks

16  to bill equipment.  It didn't matter if the equipment be coded

17  to the appropriate code for durable equipment.  They operated

18  on the model of bill the code that pays the highest, regardless

19  of what equipment is going to be provided to the beneficiary,

20  if any.

21         Carla will tell you she also brought this up to

22  the defendant, brought this up and approached the defendant

23  about things that she knew that they were doing that weren't

24  right.  And, again, she received the same response.

25         She will tell you that months went by when no

1   supplies were being provided to any beneficiary, and yet the

2   defendant instructed her to continue to bill.  She'll also tell

3   you that the defendant's response was to go door to door and

4   solicit more beneficiaries.

5          Now, I told you about that earlier.  They went

6   door to door in low income areas, areas where the residents

7   were more likely to have Medicaid benefits.  And when they did

8   that, they wore scrubs so that they looked legitimate, like a

9   legitimate medical company, going door to door and asking

10   beneficiaries for the beneficiary information so they could

11   turn around and bill Medicare and Medicaid.

12          The key to this case, as I told you a minute ago,

13   is to pay close attention to what was billed to Medicare and

14   Medicaid and what, if anything, was provided.  If you do that,

15   at the end of this case, after you've heard all of the

16   evidence, we will ask you to find the defendant guilty of

17   health care fraud.  Thank you.

18          *THE COURT:*  Mr. Essmyer?

19          *MR. ESSMYER, SR.:*  I believe the evidence --

20          *THE COURT:*  Can you speak up?  The court reporter

21   cannot hear you.

22          *MR. ESSMYER, SR.:*  Yes.  I believe there are three

23   things that are important that the evidence will show.  One is

24   that Ms. Nowlin relied upon Carla Parnell, the office manager

25   and lifelong friend, to follow the rules and regulations that

1   were plentiful in the office itself.  I believe that you will

2   see -- the exhibits will show that the Medicare and Medicaid

3   rules were in the office, that the rules were posted, that

4   there were contracts that were signed between the employees in

5   any event.  I think that's the first thing.

6        I think the second thing that the evidence will

7   show is that as to the kickback, that the government didn't go

8   into at all in its opening, that there was a safe harbor.  That

9   the evidence will show that the employees are allowed to take a

10  percentage based on your sales based on what the company is

11  performing.

12       And the third thing is that I think as to the

13  Social Security, that what the government did was it shot the

14  person who made the complaint.  Ms. Nowlin is the one that went

15  to Social Security and said, "Carla Parnell has violated the

16  Social Security rules," and for that she gets indicted along

17  with Ms. Carla Parnell, because the government's position is

18  she provided the paychecks, the money.

19       Those are the three things that I think the

20  evidence, first of all, will show.  I think the evidence will

21  also show that Ms. Nowlin was born in Bryan, Texas, that she

22  went to Bryan High, where she ended up with a G.E.D.  That she

23  went to community colleges.  That she got her dental

24  proficiency.  That she went to work for a dentist.  That among

25  other things, she drove school buses for Bryan High.

1          In early 2000, I think the evidence will show,

2   that one of her boyfriends was delivering DME, durable medical

3   equipment, and that she went along with him and helped deliver

4   DME.  And then with her background of knowledge that she had

5   gained working with the dentist and elsewhere, she decided that

6   she would like to open up a DME company.  And as the government

7   says, there's actually two names, but we can just collectively

8   call it Yellabone.  Yellabone comes from, I believe the

9   evidence would show, the fact that Ms. Nowlin was a deejay and

10  her name in the community in which she resided when she was a

11  deejay was Yellabone.  And so, yes, the people in the community

12  knew Yellabone and trusted Yellabone, the deejay.

13          As far as going door to door, while the emphasis

14  is sort of split on it, I know her intent was not illegal.  I

15  believe her intent was to help people who otherwise would not

16  have the ability to get a wheelchair and otherwise not have the

17  ability to get crutches, because they didn't know or might not

18  know that that ability is there.  It's simple marketing, simple

19  advertising.

20          Now, after Yellabone is opened, she has to learn

21  how to run a DME company.  I think the one thing that some of

22  the government's witnesses are going to show is that our

23  government is filled with regulations and that those

24  regulations exceed memory.  And that as one starts a program,

25  starts a business anywhere that's involved in the government

1   there's a learning curve.  And I think there was an early

2   learning curve and then there was the Carla Parnell learning

3   curve.

4             Mrs. Nowlin's parents both died in 2007 and 2008,

5   I think the evidence will show.  And I believe the evidence

6   will also show that perhaps she began drinking too much.  That

7   perhaps she stayed away from her business too much.  That she

8   allowed Carla Parnell to use a stamp on her checks and that she

9   no longer signed the checks.  That Carla Parnell was taught,

10  she says by Yellabone, but the books are there.  The code is on

11  the Internet.  I believe their witnesses will testify the code

12  is on the Internet.  That Carla, to generate more commissions

13  for herself, started overbilling, and that Ms. Nowlin was not

14  aware of the fraud that was being performed.

15            Now, I think also as to the individual in the

16  wheelchair, that the government is going to show you, I believe

17  the evidence, if it gets in, they're going to show you things

18  in regards to that child and it's to instill empathy in you.

19  But the problem is that when you look at the patient file,

20  there was a fight with Medicare.  They claim the wrong

21  wheelchair was put there.  Yellabone put in the paperwork to

22  get another wheelchair, and Medicare refused it.  Medicare

23  refused to provide -- and when these investigators went to that

24  child, he still didn't have the wheelchair.  And as far as I

25  know, if he got it, he just now got it in 2013.  But a fight

1   with Medicare over the proper wheelchair is not to say that

2   there's fraud.

3             I believe that the evidence will also show,

4   though, that Ms. Nowlin had no intent to commit fraud, and I'm

5   going to ask you to listen to all of the evidence before you

6   make up your mind.  And we thank you for your time.

7             THE COURT:  Ladies and gentlemen, I know you've only

8   been in court about 30 minutes, but we're going to take a short

9   break now.  I'm taking it for two reasons.  First, to show you

10  where the jury room is and let you put on your badge; and,

11  second, to let the lawyers change the order of the courtroom so

12  they can have their first witness here ready to go.

13            So when you go back to the jury room, you can

14  throw away your little paper badge, put on an official Southern

15  District of Texas juror badge.

16            Remain in the courtroom, please.  This will only

17  be a ten-minute break.  Thank you.

18       (Recess from 3:30 p.m. to 3:40 p.m.)

19       (Open court, defendant and jury present.)

20            THE COURT:  Be seated, please.

21            I'm going to have my law clerk hand you yellow

22  pads and pencils, if you would like.  I find that in a trial

23  that lasts a week or more, people like to make notes.  But you

24  weren't selected for your note-taking ability.  So if you

25  choose to take notes, please do so very sparingly.  Don't let

Brown - Direct by Ms. Frazior

1  note-taking interfere with your primary role of observing and

2  considering the testimony of the witnesses.  I take notes, but

3  I don't try to take notes verbatim.  I may jot down a

4  particular fact or date or event that will help me recall the

5  evidence later.

6          If you choose to take notes, you should not share

7  your notes with anyone else during deliberations.  And the

8  recollection of the evidence by a juror who does not take notes

9  is entitled to equal weight during the deliberative process as

10 to someone who does take notes.  So that's all I'm going to say

11 about notes.

12         The government may call its first witness.

13         *MS. FRAZIOR:*  Yes.  The United States calls Eleanor

14 Brown.

15         *MR. ESSMYER, SR.:*  While she's coming in, Your Honor,

16 the defendant would invoke the Rule.

17         *THE COURT:*  All right.  The Rule is invoked.  Anyone

18 other than the government's case agent, who will be a witness

19 in the case, must wait out in the hall and may not talk to any

20 other witness or allow any other witness to talk to him or her.

21         Please come around, ma'am, and be sworn.

22         *MR. ESSMYER, SR.:*  Your Honor, the defendant would

23 object to the government be allowed two case agents to remain.

24         *THE COURT:*  Pardon me?

25         *MR. ESSMYER, SR.:*  The defendant would object to the

Brown - Direct by Ms. Frazior

1   government being allowed two case agents.

2          *MS. FRAZIOR:*  Yes, Your Honor, we do have two, only

3   one of which will be testifying in this case.   That's Christine

4   Finnegan.

5          *THE COURT:*  Okay.  Good afternoon, ma'am.  Please

6   raise your right hand to be sworn.

7       *(Eleanor Brown, government's witness, sworn.)*

8          *THE COURT:*  Please have a seat, ma'am.  And once

9   you're comfortably seated, please tell us your name and where

10   you live.

11          *THE WITNESS:*  My name is Eleanor Ruth Magnary

12   (phonetic) Brown.  I'm from -- live in Bryan, Texas, 905 West

13   21st Street.

14                        **DIRECT EXAMINATION**

15   BY MS. FRAZIOR:

16   *Q.*  All right.  Ms. Brown, could you tell the jury how old you

17   are, too?

18   *A.*  58.

19   *Q.*  And, Ms. Brown, do you have a daughter named Jisha Brown?

20   *A.*  Yes, ma'am.

21   *Q.*  Can you tell the jury a little bit about your daughter?

22   *A.*  She's 37 years old.  She has cerebral palsy, and she's had

23   it since birth.  And she's disabled from her -- the elbows and

24   the knees, and she's in the bed.  She can't move.  She can't

25   walk.  She talks, but that's about it.

Brown - Direct by Ms. Frazior

1   *Q.*  All right.  And, Ms. Brown, what type of medical coverage
2   does Jisha have?
3   *A.*  She has Medicaid.
4   *Q.*  Okay.  And has she had that most of her life?
5   *A.*  All of her life.
6          *MS. FRAZIOR:*  Your Honor, may I approach the witness?
7          *THE COURT:*  Yes.
8   BY MS. FRAZIOR:
9   *Q.*  Ms. Brown, I'm handing you what's marked as Government
10  Exhibit 5C.  Do you recognize that photograph?
11  *A.*  This is my baby.
12  *Q.*  Okay.  And is -- that's a photograph of Jisha; is that
13  correct?
14  *A.*  Uh-huh.
15  *Q.*  And does she look just like that as she -- today as she did
16  in the photograph?
17  *A.*  Yes.
18  *Q.*  Okay.  And is that the way her body was positioned, the way
19  she looked at the time that you were interacting with
20  Yellabone?
21  *A.*  Yes.  Yes.
22  *Q.*  All right.
23         *MS. FRAZIOR:*  I'm tendering to defense counsel
24  Government Exhibit 5C and --
25         *THE COURT:*  Are you saying C as in Charles?

Brown - Direct by Ms. Frazior

1          *MS. FRAZIOR:*  C, yes, Your Honor.

2          *MR. ESSMYER, SR.:*  And I object under 403, Your Honor,

3     that it's more prejudicial than probative.

4          *THE COURT:*  Let me see the exhibit.  I can't seem to

5     find it in your book.

6          *MS. FRAZIOR:*  Here it is, Your Honor.

7          *THE COURT:*  All right.  The objection is overruled.

8     5C is admitted.

9          *MS. FRAZIOR:*  Thank you, Your Honor.  And may we

10    publish to the jury?

11         *THE COURT:*  Yes.

12    BY MS. FRAZIOR:

13    Q.  Okay.  Ms. Brown, now looking at this picture of Jisha, you

14    said she's mostly bedbound; is that correct?

15    A.  Yes.

16    Q.  All right.  And she looks like her knees are brought up a

17    little bit to her chest.  Is that her normal position?

18    A.  Yes.  She has cerebral palsy and it's spastic, so as she

19    gets older, everything tightens up like this, so.

20    Q.  All right.  And we can't see it in this photograph, but is

21    there anything unique about the way her spine is curved?

22    A.  Well, she has a curve to the left of her, in her back.

23    Q.  All right.

24    A.  She can't --

25    Q.  So she tilts sideways?

Brown - Direct by Ms. Frazior

1   A.  Yeah, she kind of tilts.  It's got a -- yeah.

2   Q.  All right.  And what type of equipment does Jisha require

3   to get around your home or out in the community?

4   A.  We use a -- we have a wheelchair.  She has to use a

5   wheelchair.

6   Q.  All right.  And the wheelchair she has currently, is it

7   motorized or is it manual?

8   A.  It's manual.

9   Q.  All right.  Ms. Brown, at some point did you become

10  involved with a company by the name of Yellabone Medical

11  Equipment?

12  A.  Yes.

13  Q.  Can you explain to the jury how you became acquainted with

14  that company?

15  A.  Well, it was just somebody had referred it.  Somebody

16  was -- you know, they were telling me that she was a black lady

17  and we needed to support black-owned business and all that.

18  And I decided because it was a local, I had been dealing with

19  the companies out of Austin and I said, "Well, I'm going to

20  give her a try because she's local."  And so I went and talked

21  to her.

22  Q.  All right.  And so did you go into the Yellabone office?

23  A.  Uh-huh.

24  Q.  All right.  And who did you speak with there?

25  A.  Yolanda.

Brown - Direct by Ms. Frazior

1  *Q.* All right.  And do you see Yolanda Nowlin in the courtroom
2  here today?
3  *A.* Oh, yes.
4  *Q.* And can you identify her by an article of clothing she's
5  wearing?
6  *A.* She's wearing the black sweater --
7  *Q.* All right.
8  *A.* -- right there.
9  *Q.* And that is the person you dealt with at Yellabone Medical
10 Equipment?
11 *A.* Yes, ma'am.
12 *Q.* All right.
13         *MS. FRAZIOR:*  I would like the record to reflect that
14 the witness has identified the defendant.
15         *THE COURT:*  The record will so reflect.
16 BY MS. FRAZIOR:
17 *Q.* All right.  Ms. Brown, what equipment were you going to try
18 to get from Yellabone Medical Equipment?
19 *A.* A wheelchair.  We had -- every five years we are qualified
20 for a new wheelchair, and so it was about the time for her to
21 get a new one.  So like I said, she was local, so I was going
22 to just, you know, see if she could do that, you know.  And if
23 she had did that right, then I was going to stay with the
24 company, because I didn't feel like going back and forth to
25 Austin all the time, so.  But we only -- I talked to her about

Brown - Direct by Ms. Frazior

1   the wheelchair and --

2   Q.  All right.

3   A.  -- that's what we made arrangements on.

4   Q.  Does Jisha have a physician that's treated her for most of

5   her life?

6   A.  Yes, Dr. Jesse Parr.

7   Q.  Jesse Parr.  All right.  And so you said -- you mentioned

8   that Jisha was able to get a wheelchair once every five years.

9   Why is that?

10  A.  Well, they just -- that's what they give us the limit on

11  them, you know, just every five years.  They feel like one

12  should last for five years.

13  Q.  And when you say "they," who are you referring to?

14  A.  The Medicaid.

15  Q.  All right.  So are you saying that that's a Medicaid rule

16  that you're familiar with?

17  A.  Uh-huh.  Uh-huh.

18  Q.  And did your doctor -- or Jisha's doctor, Dr. Parr, did he

19  routinely give you a prescription for a new wheelchair every

20  five years?

21  A.  Uh-huh.

22  Q.  So when you went to Yellabone Medical Equipment, did you

23  have a prescription with you to get the new wheelchair?

24  A.  Well, I didn't have a prescription.  They talked to

25  Dr. Parr.

Brown - Direct by Ms. Frazior

1   Q.  Yellabone --

2   A.  Yellabone, uh-huh.

3   Q.  -- contacted --

4   A.  After I talked to him and told him that I had talked to

5   them and that I was, you know, trying to get a new chair.  So I

6   guess after that, she contacted him with an order form.

7   Q.  All right.  And what information did you give Yellabone

8   Medical Equipment and specifically Ms. Nowlin about the

9   wheelchair that you needed for Jisha?

10  A.  Well, I just -- I showed -- she saw one, the one that she

11  had before that and, you know, I just told her she needed the

12  headrest and the straps to hold her and just, you know,

13  something to keep her feet, you know, because she could never

14  have them low enough to get in, like the stirrup things, so.

15  Q.  Is that because her legs are --

16  A.  Uh-huh.

17  Q.  -- angled up a little bit?

18  A.  Uh-huh.

19  Q.  Okay.  All right.  Now you mentioned that Ms. Nowlin saw

20  Jisha?

21  A.  She saw her.

22  Q.  Where was that and when was that?

23  A.  Well, she saw her at my house.  She only saw her the one

24  time, but she saw her at the house.

25  Q.  All right.  So Ms. Nowlin visited your home?

Brown - Direct by Ms. Frazior

1  *A.*  Uh-huh.

2  *Q.*  Okay.  And when she came out to your house, did she -- what

3  other conversation did you have about the wheelchair?  What

4  other things did she do?

5  *A.*  Well, she came because when they delivered it, it wasn't

6  right, and so I called her.  Because they didn't -- the guys

7  that brought it didn't know anything, so I called her and she

8  came and she checked, you know, looked at it, you know.  And I

9  was telling her that this is not right.  This is -- you know,

10 there's nothing there to hold her.  There's not a headrest and

11 all that.  So she took a list, you know, of what I was saying.

12 But that chair was -- it just wasn't equipped right.

13 *Q.*  Ms. Brown, I'm showing you what's marked as Government

14 Exhibit 5D.  Do you recognize this photograph and the picture?

15 *A.*  Yes, the chair.

16 *Q.*  All right.  Now, does this chair -- this is the way the

17 chair looks today; is that correct?

18 *A.*  Uh-huh.

19 *Q.*  All right.  At the time that Yellabone delivered the chair

20 to you, it was in new condition; is that correct?

21 *A.*  It was new, uh-huh.

22 *Q.*  All right.

23        *MS. FRAZIOR:*  I'm tendering 5D to defense counsel for

24 inspection.

25        *MR. ESSMYER, SR.:*  May I take a short voir dire, Your

Brown - Direct by Ms. Frazior

1   Honor?

2           THE COURT:  Yes.

3                        **VOIR DIRE EXAMINATION**

4   BY MR. ESSMYER, SR.:

5   Q.  As I understand your testimony, ma'am, this is not the way

6   the chair looked when it was delivered; is that right?

7   A.  No, sir.

8   Q.  This is the way the chair looked some five years later?

9   A.  Yes.  Yeah.

10          MR. ESSMYER, SR.:  I object.  There's no relevance and

11  under 403, Your Honor.

12          THE COURT:  Overruled.  It's admitted.

13          MS. FRAZIOR:  Thank you.  Can you put up 5D?

14                   **DIRECT EXAMINATION CONTINUED**

15  BY MS. FRAZIOR:

16  Q.  All right.  Ms. Brown, now, just to clarify one more time,

17  because we don't want anyone to be confused about it, this

18  chair did not look this way when you got it from Yellabone,

19  correct?

20  A.  No.  It was just a plain chair with a belt across the

21  middle.

22  Q.  Has Jisha ever been able to use this chair?

23  A.  No, never.

24  Q.  Where has it been stored?

25  A.  It's in my storage shed in my backyard.

Brown - Direct by Ms. Frazior

1  Q.  All right.  When you received this chair, what did you do

2  after that?

3  A.  Well, I -- you know, after I talked to her and she -- I

4  explained to her, well, we need it and she went back to her

5  office, but I called her a couple of times and she said she was

6  waiting on the stuff to come.  So what I did was I bought a pad

7  to go on the seat because it was just too hard and some kind of

8  way I fixed this head thing up here to try to hold her with

9  some towels and some stuff that I taped together just to see if

10  I could hold her, but it was still just too wide and she

11  couldn't sit.  She kept going, you know, so we just could not

12  use it at all.

13  Q.  All right.  Are you saying that this headrest, as reflected

14  on 5D, was not there when the chair was delivered to you?

15  A.  No.  No.  I put that on there to help hold her head.

16  Q.  And it does look like there are some straps around the

17  back; is that correct?  Am I seeing that correct?

18  A.  Actually the straps that came around the middle.

19  Q.  Was it the size -- a kind of strap that you could adjust

20  for Jisha?

21  A.  No.  It was, like, way out to here.  I couldn't even use

22  it.

23  Q.  Now this is not Jisha's first wheelchair ever, right?

24  A.  No.  She's had about three or four before that.

25  Q.  So the wheelchairs she had prior to that, were you familiar

1  with all the things that she needed on it?

2  A.  Uh-huh.

3  Q.  And did you tell all of that to the defendant?

4  A.  Uh-huh.

5  Q.  Given that you stated that this wheelchair was not usable

6  by Jisha, how did she get around?

7  A.  Well, at that time we had a bath chair that had wheels on

8  it and so we would use that.  We would -- you know, I would

9  take it and put it inside of whatever and then carry it and put

10  it inside of it.  So she would use that to sit up in.

11  Q.  All right.  And what if she had to go to the doctor's

12  office or something like that?

13  A.  We take -- took that.

14  Q.  You took the bathtub chair out?

15  A.  Uh-huh.

16  Q.  All right.  Once you received this chair and you realized

17  it was not going to work for Jisha and it wasn't what you

18  requested, what did you do to try and solve the problem?

19  A.  Well, after I talked to her a couple times and she never

20  came back or never returned any of my calls, what I did was I

21  looked on the chair and got the company name.  And I had

22  e-mailed some copies of the -- pictures of the chair and I was

23  telling them the things that I needed on there.  But when they

24  got my e-mail, they e-mailed me back and said that they wasn't

25  familiar with what I was talking about, so.

Brown - Direct by Ms. Frazior

1   Q.   Okay.  So you contacted the manufacturer of the chair --
2   A.   Uh-huh.
3   Q.   -- to try and resolve your issues with them?
4   A.   Uh-huh.
5   Q.   All right.  Now, when were you able to get the next chair
6   for Jisha after this one wasn't going to work for you?
7   A.   It wasn't until after five years was up and then we reapply
8   -- you know, we could reapply.
9   Q.   So you were not able to get another chair for five years?
10  A.   No.
11  Q.   So for five years you used --
12  A.   The bath chair.
13  Q.   The bath chair.  And does Jisha now have another
14  wheelchair?
15  A.   Yes.
16  Q.   All right.  And does the wheelchair she have now fit her
17  needs?
18  A.   Uh-huh, yes.
19  Q.   All right.  Ms. Brown, I'm showing you what's marked as
20  Government's Exhibit 5E.  Do you recognize that photograph?
21  A.   Uh-huh, that's the new chair.
22  Q.   All right.  And does that chair look the same today as it
23  did in the photograph?
24  A.   Uh-huh.
25  Q.   All right.

Brown - Direct by Ms. Frazior

1   A.  It looks exactly like that.

2   Q.  Thank you.  And this is not a chair you received from

3   Yellabone Medical Equipment --

4   A.  No.

5   Q.  -- is that correct?

6   A.  It didn't even look like that.

7   Q.  All right.

8        MS. FRAZIOR:  I'm tendering Government's Exhibit 5E to

9   defense for objection.

10        MR. ESSMYER, SR.:  May I have a short voir dire, Your

11   Honor?

12                    **VOIR DIRE EXAMINATION**

13   BY MR. ESSMYER, SR.:

14   Q.  This chair was delivered to you in what year?

15   A.  Let's see.  We've had it about five -- five or six years

16   now.

17   Q.  And when was this picture taken, 5E?

18   A.  Probably about three or four months ago.

19        MR. ESSMYER, SR.:  No objection, Your Honor.

20        THE COURT:  All right.  Government Exhibit 5E is

21   admitted.

22        MS. FRAZIOR:  Thank you.

23                 **DIRECT EXAMINATION CONTINUED**

24   BY MS. FRAZIOR:

25   Q.  All right.  Ms. Brown, let's talk about some of the

Brown - Direct by Ms. Frazior

1   features on this chair.  Can you describe the chair's features
2   for the jury?
3   A.  Well, it's got a headrest to hold her head.  And then the
4   straps right there, they come over her shoulders and down her
5   middle and they snap on the sides to hold her in.  And they
6   have the seat that's molded to hold her body to keep it from
7   slipping from side to side.  And then the seat is kind of built
8   up so that her legs can fit, you know, properly without -- you
9   know, it won't be on a strain -- you know, in a strain trying
10  to stay up.
11  Q.  All right.  And is she able to get around using this
12  wheelchair?
13  A.  Uh-huh.  Yes.
14  Q.  Now, Ms. Brown, at some point did you determine that you
15  needed a hospital bed?
16  A.  Well, when I was 55 I decided to try for a bed.
17  Q.  For Jisha?
18  A.  Uh-huh.
19  Q.  And what did you do?
20  A.  Well, what I -- what we did, they sent me a letter saying
21  that we already had a bed.
22  Q.  And just to be clear, who is "they" that sent you a letter?
23  A.  Medicaid sent me a letter telling me that I already had a
24  bed and that I didn't need another one.
25  Q.  Did you have a bed?

Brown - Direct by Ms. Frazior

1   *A.*  No.

2   *Q.*  What were you using for Jisha?

3   *A.*  Well, when -- we used twin beds.  The twin beds, it was

4   like three -- at first it was three mattresses and then as the

5   years passed, we put four mattresses on top and then it made it

6   easier.  So it was, like, four twin mattresses stacked on top

7   of each other.

8   *Q.*  All right.  And did you try and resolve the problem with

9   Medicaid, when they told you that you already had a hospital

10  bed but you knew you didn't?

11  *A.*  No.  No.  Because I really wasn't that gung-ho about the

12  bed, you know, at that moment, because I felt like that other

13  bed was better but then -- and then later on I decided to -- I

14  just didn't worry about it.

15  *Q.*  Okay.

16  *A.*  We just -- we just kept four mattresses.

17  *Q.*  Okay.  So you continued to use the four mattresses?

18  *A.*  Uh-huh.

19  *Q.*  Did you ever find out why Medicaid was telling you that you

20  already had a hospital bed when you didn't?

21        *MR. ESSMYER, SR.:*  Excuse me, Your Honor.  Objection.

22  Hearsay.

23        *THE COURT:*  That question just asked for a "yes" or

24  "no" answer.  You can say whether you found out or not, but not

25  how you find out.

Brown - Cross by Mr. Essmyer, Sr.

1   A.  I found out later, uh-huh.

2   Q.  Thank you.  And do you have a hospital bed now for Jisha?

3   A.  Yes.  We have one donated to us.

4   Q.  How did you get it donated?

5   A.  One of my cousin's mother was living in his home and --

6   while she was sick and when she passed away, they had a bed and

7   they called me and asked me if we wanted it, so we took it.

8   Q.  Okay.

9   A.  That was about three years ago.

10  Q.  And, Ms. Brown, I want to back up just a little bit.  You

11  mentioned that the defendant came to your home to review the

12  wheelchair that they provided you originally?

13  A.  Uh-huh.

14  Q.  Did anybody else from Yellabone Medical Equipment ever come

15  to your home?

16  A.  Well, no, except the two delivery guys that brought it, but

17  no.

18  Q.  Did anybody come and take measurements of Jisha from

19  Yellabone Medical Equipment?

20  A.  No.

21  Q.  Are you familiar with a man by the name of Gary Johnson?

22  A.  Huh-uh.  No.

23  Q.  Does Jisha have a physical therapist that works with her?

24  A.  She's had -- every time she needed a chair or any time she

25  needs to be measured or anything, they -- this therapist named

Brown - Cross by Mr. Essmyer, Sr.

1    Russ comes and does it.  And he's been there three to four
2    times.
3    Q.  For each time a new wheelchair is being ordered?
4    A.  Uh-huh, uh-huh.  Before that the rehabilitation center was
5    doing it.
6    Q.  Okay.  And the last thing, Ms. Brown, does Jisha have
7    Medicare?
8    A.  No.  She's on Medicaid.
9    Q.  Medicaid.  All right.  Thank you.  All right.
10            *MS. FRAZIOR:*  I pass the witness.
11            *THE COURT:*  Okay.  Mr. Essmyer.
12                          **CROSS-EXAMINATION**
13   BY MR. ESSMYER, SR.:
14   Q.  Good afternoon.
15   A.  Good afternoon.
16   Q.  You and I have never spoken, have we, ma'am?
17   A.  No, sir.
18   Q.  And I understand at one time there was somebody that was
19   trying to talk to you on behalf of Ms. Nowlin and you did not
20   talk to that person; is that fair?
21   A.  You mean a phone call?
22   Q.  Well --
23   A.  Somebody did call me by phone.
24   Q.  Okay.  And you didn't talk to that person.  But you did
25   talk to the government starting in 2009; is that fair?

Brown - Cross by Mr. Essmyer, Sr.

1   *A.*   The government?

2   *Q.*   Yes.

3   *A.*   Who is the government?

4   *Q.*   These fine people here are the government.

5   *A.*   Oh, Mr. Richard -- Rich?  Yes, I did.

6   *Q.*   You talked with an investigator by the name of Mr. Dan

7   Castillo?

8   *A.*   Uh-huh.  It was two of them.

9   *Q.*   And you told him that you had already ordered a bed from

10  Yellabone, correct?

11  *A.*   No.

12  *Q.*   So if he put that in his notes, that would be incorrect?

13  *A.*   Well, I mean, maybe he took it out of context, because I

14  did tell him that I tried to order a bed, but I didn't say

15  when, but, you know, which I did a couple of years ago.

16  *Q.*   Now, you said that the photo does not show it, the

17  wheelchair, as delivered, correct?

18  *A.*   No, it doesn't.  It was brand-new.

19  *Q.*   And so the damage that is shown on the picture is from your

20  storage area; is that correct?

21  *A.*   Right.  Yes, sir.

22  *Q.*   And it had straps on it, but those are gone, when the

23  picture was taken?

24  *A.*   No, they're still on there.

25  *Q.*   All the straps?

Brown - Cross by Mr. Essmyer, Sr.

1  A.  Only one strap.  It's on there.

2  Q.  Okay.  But were all the straps on there?

3  A.  It was only one strap, and it's still on there.

4  Q.  Do you remember a person by the name of Mr. Johnson who

5  came and measured -- or tried to measure your child before the

6  wheelchair was delivered?

7  A.  No.

8  Q.  Do you remember telling Mr. Castillo that somebody came by

9  to try to measure?

10  A.  No.

11  Q.  Now, as I understand it, you did not become a customer

12  because of somebody coming door to door or anything like that?

13  You became a customer because somebody recommended them,

14  correct?

15  A.  Right.

16  Q.  And they thought they were doing a good job; is that fair?

17  A.  Yes, I assume.

18  Q.  And they thought it was good to have a black industry in

19  the community; is that fair?

20  A.  Yes, sir.

21  Q.  And when it was delivered, the wheelchair, you signed a

22  delivery form, didn't you, ma'am?

23  A.  Uh-huh.

24  Q.  And you also signed other forms saying that the product was

25  the product that you had ordered, didn't you?

Brown - Cross by Mr. Essmyer, Sr.

1   A.  No.

2   Q.  Well, the delivery form says this is the product that you

3   ordered, doesn't it?

4   A.  I signed a paper that they -- when he brought me the chair

5   and I signed that, but that was it.

6   Q.  And you are aware that after you called Ms. Nowlin, that

7   she made a complaint to Medicare -- I'm sorry, Medicaid?

8   A.  I didn't -- I wasn't aware.

9   Q.  Do you remember Mr. Castillo showing you the complaint that

10  she sent to Medicaid?

11  A.  Huh-uh, I don't remember.

12  Q.  And you're saying it looks like she just copied word for

13  word what I -- the complaints I had?

14  A.  She -- from the words that I had told her that I needed for

15  the chair maybe.

16  Q.  Do you remember telling the agent that that letter that she

17  took --

18  A.  I don't remember.

19  Q.  -- was almost word for word your complaints?

20  A.  I don't remember telling him that.

21  Q.  Later on you were interviewed by another agent, were you

22  not, Mr. McCollum?

23  A.  Uh-huh.

24  Q.  And you denied to Mr. McCollum that you had ever talked to

25  Yellabone about a bed, didn't you?

Brown - Cross by Mr. Essmyer, Sr.

1   A.  I didn't talk to Yellabone about a bed, never.

2   Q.  Were you renting the chair or purchasing the chair, ma'am?

3   A.  Medicaid was purchasing it.

4   Q.  Were they renting it for you or purchasing it for you?

5   A.  Purchasing.

6   Q.  You know Carla Parnell, do you not?

7   A.  No, sir.

8   Q.  You don't know Carla Parnell?

9   A.  Huh-uh.

10  Q.  And you didn't talk to one of the agents about Carla

11  Parnell and the Parnell family?

12  A.  No.  I talked to a secretary when I went to her office, but

13  I didn't ask her her name.  I don't know who she was.

14  Q.  I'm not asking you if you talked to Carla Parnell at

15  Yellabone.  I'm asking you --

16  A.  I haven't talked -- I don't know her.

17  Q.  You don't know Carla Parnell at all?

18  A.  Huh-uh.  Huh-uh.

19  Q.  Do you remember being asked by Rick McCollum and Christine

20  Fritz, who's sitting -- do you see the lady right there?  Do

21  you recognize her?

22          MS. FRAZIOR:  Objection.  Hearsay to referring to what

23  the agents asked.

24          THE COURT:  Overruled.  Ask the question.

25  BY MR. ESSMYER, SR.:

Brown - Cross by Mr. Essmyer, Sr.

1  *Q.*  Do you recognize the lady there as one of the agents who
2  interviewed you?
3  *A.*  That one, uh-huh.
4  *Q.*  And do you remember telling her when asked about Carla
5  Parnell, that you know Carla Parnell, but explained that no one
6  messes with the Parnells, they're awful, terrible people?
7  *A.*  I probably did say that part, but I didn't say I know her,
8  because I don't know her.
9  *Q.*  So you disavow the part where it says, "Brown knows Carla
10  Parnell"?
11 *A.*  Well, the Parnells are bad people, but I don't know Carla.
12 *Q.*  And you've never seen the letter to Medicare?
13 *A.*  Huh-uh.
14 *Q.*  Have you seen your son's (sic) patient file?
15 *A.*  My what?
16 *Q.*  The file that's kept at Yellabone?
17 *A.*  Have I seen it?
18 *Q.*  Yes.  Have you -- let me start -- let me ask it another
19  way.  What did you review here in preparation for your
20  testimony today?
21 *A.*  I saw a folder yesterday.
22 *Q.*  What folder did you see, ma'am?
23 *A.*  I guess it was mine.  It was about that thick.  But I
24  couldn't understand why it was so big.  I only ordered a
25  wheelchair.

Brown - Cross by Mr. Essmyer, Sr.

1      *MR. ESSMYER, SR.:*  I move for the introduction of
2   government exhibit -- I believe it's --
3      *THE COURT:*  Government exhibit what?
4      *MR. ESSMYER, SR.:*  Just a moment, Your Honor.   5B.
5   And this is the original folder that I'm handing to the
6   witness, Your Honor.
7      *THE COURT:*  All right.   Government Exhibit 5B is
8   admitted.
9   BY MR. ESSMYER, SR.:
10  *Q.*  Did you review that file, ma'am, in preparation for your
11  testimony here today?
12  *A.*  I didn't review it.   I saw it, but I didn't review it.
13  This is my folder?
14  *Q.*  Well, it's your daughter's folder.   But you didn't look at
15  it?
16  *A.*  Huh-uh.
17  *Q.*  What else, if anything, did you review in preparation for
18  your testimony here today?
19  *A.*  Nothing.
20  *Q.*  Who did you talk to in -- not going into what was said, but
21  who did you talk to in preparation for your testimony here
22  today?
23  *A.*  I'm sorry.   I talked to Mr. McCollum and her.   I can't
24  remember her name, I'm sorry.
25  *Q.*  All right.   And they didn't go through the file with you?

Brown - Cross by Mr. Essmyer, Sr.

1  A.  She was looking through the file, but I didn't, because I

2  really didn't -- I was trying to figure out why it was so big,

3  because we only had a wheelchair.  But she did flip through it,

4  but I didn't.

5  Q.  Do you remember writing a voluntary statement on October

6  the 30th, 2009?  I think it's not in the file, ma'am.

7  A.  I'm sorry?

8  Q.  I'm just asking from your memory, do you remember

9  handwriting a voluntary statement on October 30th of 2009?

10  A.  No, I don't remember.

11  Q.  Do you remember at that time saying that I talked to

12  Yolanda about getting a bed?

13  A.  No, I didn't say that.

14       MR. ESSMYER, SR.:  May I approach the witness, Your

15  Honor?

16       THE COURT:  Yes.

17       MR. ESSMYER, SR.:  I hand her the document marked

18  "voluntary statement form."

19  BY MR. ESSMYER, SR.:

20  Q.  Is that your signature, ma'am?

21  A.  That doesn't look like it.  Huh-uh.  This right here?

22  Q.  Is that your signature?

23  A.  That right there?

24  Q.  Is that your statement, ma'am?

25  A.  Huh-uh.  I don't remember writing this, but okay.

Brown - Cross by Mr. Essmyer, Sr.

1  Q.  Well, is that -- I just want to know, is that your

2  statement or is that not your statement?

3  A.  I didn't write this.  I didn't -- I don't remember this.

4  No.

5  Q.  Okay.  But is it your statement or not your statement?

6        MS. FRAZIOR:  Your Honor, I object to asked and

7  answered.

8        THE COURT:  Sustained.

9  BY MR. ESSMYER, SR.:

10  Q.  Thank you.

11  A.  No, I didn't say that.  That last part is nothing I would

12  say.

13  Q.  Do you know why it would be attached to Mr. Castillo's

14  report?

15        MS. FRAZIOR:  Objection.  Calls for speculation.

16        MR. ESSMYER, SR.:  I withdraw the question, Your

17  Honor.

18  BY MR. ESSMYER, SR.:

19  Q.  You first complained to Medicaid in 2009, correct?

20  A.  Uh-huh.

21  Q.  And you were interviewed by Mr. Castillo on October the

22  30th of 2009, correct, give or take a day or two, I mean?

23  A.  I'm trying to remember Mr. Castillo.  But if it was the man

24  that was with Mr. Rick, then, yeah.

25  Q.  Mr. McCollum was there also, is that what you're saying?

Brown - Cross by Mr. Essmyer, Sr.

1   A.   Uh-huh.

2   Q.   You remember Mr. McCollum being there?

3   A.   Yeah, I remember him being there, coming a couple of times.

4   Q.   All right.  So you talked to Medicaid as early as October

5   the 30th, 2009, but you did not get any remedy on your

6   wheelchair until the five years had expired; is that fair?

7   A.   I talked to Medicaid probably in -- it was either 2009 or

8   2010, because I was trying to figure out why we couldn't get

9   the bed, because I had -- I was trying to order one.  And I

10  called to see what was going on, because they had sent me

11  another letter saying that I already had a bed.  And then I

12  called them to talk to them, to explain to them that I don't

13  have a bed.

14  Q.   I'm talking about the wheelchair, ma'am.

15  A.   Well --

16  Q.   You talked to --

17  A.   -- I didn't talk to Medicaid about the wheelchair.  I

18  talked to Medicaid about the hospital bed when I was trying to

19  get one and couldn't get one.  I didn't talk to Medicaid about

20  a wheelchair -- that wheelchair.

21  Q.   I think we're getting a little -- I'm confused.

22  A.   Yeah, I'm sure you are.  But, no, I never called

23  Medicaid --

24  Q.   But in October of 2009 --

25  A.   Uh-huh.

Brown - Redirect by Ms. Frazior

1   *Q.*  -- you talked to Rick McCollum who represents Medicaid for

2   the State of Texas?

3   *A.*  Right.

4   *Q.*  And you complained about the horrible wheelchair, correct?

5   *A.*  Uh-huh.  Right.

6   *Q.*  And nothing was done by Medicaid for approximately five

7   years; is that fair?

8   *A.*  Right.

9   *Q.*  Thank you, ma'am.

10            *MR. ESSMYER, SR.:*  Pass the witness, Your Honor.

11                        **REDIRECT EXAMINATION**

12   BY MS. FRAZIOR:

13   *Q.*  Ms. Brown --

14   *A.*  Uh-huh.

15   *Q.*  -- regardless of whether you asked -- excuse me.

16   Regardless of whether you asked Yellabone Medical Equipment to

17   get you a hospital bed or not, did they ever provide you with a

18   hospital bed?

19   *A.*  No.  And I never asked them.  That was a test with the

20   chair.  If she had did good with the chair, then I would have

21   stayed with the company and probably got the bed and the

22   Pampers and everything else that I get.  But the chair never

23   worked, so I didn't even contact her about anything else,

24   except to see if she would fix the one that she brought me.

25   But I never heard anything more from her, so I just waited the

Brown - Redirect by Ms. Frazior

1   five years and got a new one.

2   Q.  All right.  And I'm showing you Government's Exhibit 5B.

3   Can you see a document pulled up on the screen up there that is

4   this document right here?

5   A.  Okay.

6   Q.  It's a letter in the file.  And you may not be able to read

7   it up there.  But can you read what that letter says to the

8   jury?

9   A.  Okay.  No, I can't see this.  It has a hospital bed and

10  this time that no longer works and cannot be repaired.  Part

11  had -- huh-uh.

12  Q.  Does it say, "Patient has had this bed"?

13  A.  It says, "PT has had this bed for several years and need

14  one at this time.  PT needs this bed because PT cannot sit up.

15  PT needs to be elevated at different times of the day to keep

16  from choking."  Huh-uh.

17  Q.  All right.

18  A.  "I have to say there's no way you can get" --

19  Q.  You never spoke to Yellabone about getting a hospital bed?

20  A.  No.  And my daughter won't choke if she's not elevated.

21  She eats too good.

22  Q.  All right.  And you never had a hospital bed prior to the

23  one that you have now, right?

24  A.  Never.  Never.

25  Q.  And the one that you have now was donated to you; is that

Brown - Redirect by Ms. Frazior

1   correct?

2   A.  Uh-huh, exactly.  I didn't talk to her about a hospital

3   bed, because at this time I didn't think I needed one.

4   Q.  When you say you didn't think you needed one, you mean you

5   were making do with what you had?

6   A.  Right.  And plus I was younger.  You know, it wasn't until,

7   like, I turned 55 that I decided to try to get a bed because I

8   might need it since I'm getting older.  But before that, I

9   never even considered it.  I never considered it.

10  Q.  All right.  Thank you.  And can you look up on the screen

11  there and -- excuse me for just a moment.

12  A.  What is that?

13  Q.  All right.  Can you see this letter that's been posted on

14  the screen there?

15  A.  Uh-huh.

16  Q.  That's also from Government Exhibit 5B.  Who is that --

17  first of all, what is the date on that letter?

18  A.  10-2-04.

19  Q.  And who is it written to?

20  A.  Medicare.

21  Q.  Does it say "Attention:  Medicare"?

22  A.  Uh-huh.

23  Q.  All right.  And it appears to be -- can you just go ahead

24  and read for the jury what that -- the language there under

25  "Attention:  Medicare"?

Brown - Recross by Mr. Essmyer, Sr.

1  A.  "The other chair that the patient has is not working out
2  for the patient.  I sent over a physical therapist who did a
3  complete assessment evaluation for the patient, so the patient
4  can get another chair that will help the patient ambulate, help
5  with necessities, seat patient more comfortably and has more
6  safety features.  I have enclosed a new assessment and an order
7  form for a new chair."
8  Q.  All right.  You mentioned that this letter is addressed to
9  Medicare.  Does Jisha have Medicare?
10  A.  No.  She has Medicaid.
11  Q.  Okay.  Thank you.
12        MS. FRAZIOR:  Pass the witness.
13                    **RECROSS-EXAMINATION**
14  BY MR. ESSMYER, SR.:
15  Q.  Until the agent for Medicaid brought it to your attention,
16  you had never seen this letter; is that fair?
17  A.  No.
18        MR. ESSMYER, SR.:  Pass the witness.
19        MS. FRAZIOR:  Nothing further.
20        THE COURT:  All right.  Ladies and gentlemen, we're
21  going to adjourn in just a moment.  Let me give you some
22  information about our schedule.
23            We start at 8:30 in the morning, and we generally
24  break around 4:30.  I've looked at the questionnaires and I
25  know a lot of you live a good distance from the federal

1  courthouse here.  And if you're not familiar with downtown
2  Houston traffic in the morning, it can be very difficult.  I
3  see some of you are going to come in on 45.  Some of you will
4  come in 290 from Bryan.  The traffic is frequently bumper to
5  bumper on those highways in the morning.  We do start at 8:30;
6  but if we don't have everyone here, we can't start on time.  So
7  let me encourage you, especially tomorrow morning, especially
8  since school just started, to leave your home early enough so
9  that you can be here on time.
10          The first juror to arrive, if he or she drinks
11  coffee, should make a pot of coffee.  We will have an
12  assortment of pastries or other edibles by 7:45.  So it will
13  give you a chance to calm down after the drive, have a bite,
14  have a cup of coffee, and be ready to go.
15          If for some reason you realize you cannot be here
16  by 8:30, our phone number is on your badge, so please call us.
17  We will be here by 7:30.  Before then you can leave a message
18  on the record-a-phone, if there's some emergency that should
19  arise tonight or in the morning and you realize you cannot be
20  here.  As I said earlier, my goal is to move through the trial
21  as quickly as possible and get in about seven hours -- excuse
22  me, about six hours of evidence a day, but if we can't start on
23  time, it means we have to use more days.  And I think most
24  people would prefer to work fewer days even if it means leaving
25  home early.

1            I know what the drive is like.  My youngest son

2   lives in Houston and teaches at A & M.  So I'm familiar with

3   the traffic schedule.  So I'm not speaking hypothetically.  I

4   know what it can be like.  So please tomorrow morning, leave

5   early enough so you can be here on time.

6            When you arrive here, go directly to the jury

7   room.  Do not come in the courtroom.  We will always have you

8   escorted to and from the jury room.

9            If you're making notes, you may leave your note

10  pad in the jury room.  Nobody will disturb your notes.

11           We have a refrigerator, if you would like to

12  bring your lunch.

13           Any other questions?  Thank you.  I'll see you

14  tomorrow morning at 8:30.  You're excused.

15       *(Jury not present.)*

16       *THE COURT:*  Thank you, Ms. Brown.  You're excused.

17       *THE WITNESS:*  Thank you.

18       *THE COURT:*  Who will the government's witnesses be

19  tomorrow?

20       *MS. BRADLEY:*  First off will be Sharon Thompson, Your

21  Honor.  She's the Medicaid person that will testify.  I think

22  she'll testify probably two hours.  There's a lot of stuff to

23  go through, a lot of paper.

24       *MS. FRAZIOR:*  And then after that we'll have Jonathan

25  Bergey and Scott Ward and Dan Castillo.

1     *THE COURT:*  Okay.

2     *MR. ESSMYER, SR.:*  Could they repeat that again?

3     *MS. FRAZIOR:*  Sure.

4     *THE COURT:*  Okay.  I'll see y'all in the morning.

5 And, Ms. Nowlin, let me encourage you to leave early, too,

6 because I listened to the radio this morning.  It was an hour

7 from Barker Cypress to town on 290, so.

8     *THE DEFENDANT:*  Coming back up, I left at 8:00 this

9 morning and got here at 9:30.

10     *THE COURT:*  That's pretty quick.

11     *THE DEFENDANT:*  And I was going the speed limit.

12     *THE COURT:*  I know.  I don't care about the speed

13 limit.  But just leave early tomorrow.  Okay?

14     *THE DEFENDANT:*  Yes, sir.

15     *THE COURT:*  Thank you.  We'll see everybody at 8:30.

16   *(Concluded at 4:20 p.m.)*

17           * * *

18 I certify that the foregoing is a correct transcript from the

19 record of proceedings in the above-entitled cause, to the best

20 of my ability.

21

22 /s/ *Kathy L. Metzger*      *1-19-2014*

  Kathy L. Metzger        Date

23 Official Court Reporter

24

25